*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0342P (6th Cir.)
File Name: 03a0342p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MARY CHERRINGTON and
DAIJA KING, a minor, by and
through her mother and next
friend, Mary Cherrington,
          *Plaintiffs-Appellants,*

v.

ANDRE SKEETER, JOHN
KINNEY, and CITY OF
CIRCLEVILLE, OHIO,
          *Defendants-Appellees.*

No. 01-3637

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00462—George C. Smith, District Judge.

Argued: August 7, 2002

Decided and Filed: September 24, 2003

Before: MOORE and GILMAN, Circuit Judges;
ROSEN, District Judge.[*]

———————————

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Jeffery M. Blosser, KEVIN O'BRIEN & ASSOCIATES, Columbus, Ohio, for Appellants. Brian M. Zets, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, for Appellees. **ON BRIEF:** Jeffery M. Blosser, KEVIN O'BRIEN & ASSOCIATES, Columbus, Ohio, for Appellants. Brian M. Zets, Philip K. Hartmann, Stephen Jesse Smith, SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, for Appellees.

ROSEN, D. J., delivered the opinion of the court, in which GILMAN, J., joined. MOORE, J., concurred in the result only.

———————————

## OPINION

———————————

ROSEN, District Judge. Plaintiffs/Appellants Mary Cherrington and her daughter, Daija King, appeal the District Court's decision to grant summary judgment in favor of Defendants/Appellees Andre Skeeter, Jon Kinney, and the City of Circleville, Ohio in this action brought under 42 U.S.C. § 1983. For the reasons stated below, we affirm in part and reverse in part the rulings of the District Court, and remand this case for further proceedings.

## I.  *FACTUAL AND PROCEDURAL BACKGROUND*

In the summer of 1996, the Defendant/Appellee City of Circleville, Ohio commenced an undercover law enforcement investigation in response to concerns of increased illegal drug trafficking activities within the City. Because of insufficient resources and a concern that the City's traditional police force could not conduct an anonymous undercover operation amidst Circleville's small population, the City sought outside

assistance in its investigation.     Specifically, Defendant/Appellee Police Chief Jon Kinney contacted a private security firm, which in turn referred Chief Kinney to Defendant/Appellee Andre Skeeter, a private investigator. Based on this referral, Chief Kinney met with Skeeter, reviewed his credentials, conducted a background check, and then decided to hire him.

Skeeter was sworn in as a police officer on September 3, 1996, and began his undercover investigation under the direct supervision of Investigator Kevin Clark. Skeeter spoke with Clark on a regular basis, and submitted periodic reports on the progress of his investigation. Skeeter also met from time to time with Chief Kinney.  Throughout his investigation, Skeeter was not told to target any particular individuals, but rather was directed to go out into the Circleville community, befriend people, and determine who to target for further investigation.  Through these efforts, Skeeter came into contact with Plaintiff/Appellant Mary Cherrington. The two became friends, periodically smoking marijuana or snorting cocaine together.[1]

After nearly a year of this investigation, Chief Kinney, Investigator Clark, Skeeter, and the county prosecutor decided to conclude the matter by arresting selected individuals and seeking their cooperation in additional drug purchases. Chief Kinney further determined, in consultation with the county prosecutor, that these individuals should be taken to a motel rather than the Circleville police department or the county jail, in order to avoid tipping off potential targets of this "buy-bust" operation.  Skeeter chose Cherrington as one of the individuals to arrest, believing that she might be willing to cooperate with the authorities.

---

[1]Skeeter testified at his deposition that he did not actually ingest these drugs, but merely pretended to do so.

Accordingly, on the evening of Friday, August 29, 1997, Skeeter arranged for a mutual acquaintance, Leslie Jones, to go to Cherrington's residence and ask her to purchase $100 worth of cocaine. Cherrington agreed, left her home to make the purchase, and returned about a half an hour later. A short time later, Cherrington's friend, Scott Smallwood, arrived at her house and began smoking crack in the kitchen.  Skeeter then arrived at Cherrington's home, accompanied by another law enforcement agent.   Upon witnessing Smallwood smoking crack and learning that Cherrington had made the requested cocaine purchase, Skeeter placed both Cherrington and Smallwood under arrest.  This arrest apparently occurred at around 2:30 a.m. on Saturday, August 30, 1997.

Cherrington was told to pack a bag, and Skeeter then drove her and her two-year-old daughter, Plaintiff/Appellant Daija King, to a Travel Lodge motel at the outskirts of Circleville. At around 3:15 a.m., Cherrington signed a form indicating that she had been advised of her *Miranda* rights by Inspector Clark, and that she had agreed to waive these rights and voluntarily speak to the police.  Cherrington remained at the motel with her daughter for the next 24 hours, during which time she cooperated with the authorities by arranging a drug purchase.  Cherrington testified at her deposition that she requested permission to contact someone to pick up Daija, but that this request was refused, leading her to surreptitiously call a friend to come and get her daughter. Before this friend could arrive, however, Cherrington and Daija were taken from the motel and placed in a police car.

On Sunday, August 31, 1997 at 3:37 a.m., about 24 hours after her arrest, Cherrington was taken to the Circleville police department for processing and placed in a cell.  Her daughter Daija was released to a friend.  Over 48 hours later, at around 8:30 a.m. on Tuesday, September 2, 1997,[2]

---

[2]The local courts were closed on Monday, September 1, 1997 for the Labor Day holiday.

Cherrington was arraigned on drug trafficking charges. She subsequently pled guilty to two counts of trafficking in cocaine.

Based on these incidents, Plaintiffs/Appellants Mary Cherrington and Daija King brought this § 1983 suit on May 13, 1999, alleging that Defendants/Appellees Skeeter, Kinney, and the City of Circleville violated their rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.[3] By Opinion and Order dated May 11, 2001, the District Court granted Defendants' motion for summary judgment, denied Plaintiffs' motion for summary judgment, and ordered that Plaintiffs' claims be dismissed. Through their present appeal, Plaintiffs challenge only certain aspects of the lower court's decision: (i) the dismissal of Daija King's claims; (ii) the grant of qualified immunity to the individual Defendants on Mary Cherrington's Fourth Amendment claim of an unlawfully prolonged detention without arraignment; and (iii) the determination that Plaintiffs failed to identify a basis for municipal liability against the Defendant City of Circleville. We affirm the first of these rulings, but reverse and remand on the remaining two points.

## II. *ANALYSIS*

### A. The Standards Governing This Appeal

This case is on appeal from the District Court's grant of summary judgment to Defendants. Accordingly, we review this District Court ruling *de novo*. *See Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Likewise, to the extent that this appeal challenges the District Court's decision to

---

[3]It is not clear whether Plaintiffs also meant to assert state-law claims in their complaint. In any event, upon determining that Plaintiffs' federal claims were subject to dismissal, the District Court declined to exercise its supplemental jurisdiction over any remaining state-law claims, and Plaintiffs do not challenge this aspect of the lower court's ruling.

confer qualified immunity upon the individual Defendants, we review this question of law *de novo*. *See Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

### B. The Individual Defendants Are Protected by Qualified Immunity Against the § 1983 Claims Asserted by Daija King.

Among the grounds advanced in Defendants' summary judgment motion in the court below, the individual Defendants, Andre Skeeter and Chief Kinney, argued that they were shielded from liability under 42 U.S.C. § 1983 by the doctrine of qualified immunity. In addressing the § 1983 claims asserted by Plaintiff Daija King, the District Court did not explicitly conduct a qualified immunity analysis, but instead found more generally that the individual Defendants did not act "objectively unreasonabl[y] under the circumstances" in electing to keep mother and daughter together during the arrest and initial detention of Plaintiff Mary Cherrington. (District Court Op. at 6, J.A. at 715.) Upon assessing Defendants' conduct under the standards of qualified immunity, we reach the same conclusion.

The Supreme Court has instructed that a qualified immunity inquiry generally entails two discrete analytical steps. As a threshold matter, we must ask whether the record, viewed most favorably to the plaintiff, establishes that "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001); *see also Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." 533 U.S. at 201, 121 S. Ct. at 2156; *see also Burchett*, 310 F.3d at 942.

To this point, the parties have made little effort to identify the constitutional rights of Daija King that might have been implicated by Defendants' conduct. Indeed, the record on appeal fails to indicate that the parties even addressed Daija King's claims in their submissions to the District Court. Plaintiffs' appellate brief offers only slightly more guidance, summarily asserting that Daija was "falsely arrested and illegally detained." (Plaintiffs/Appellants Br. at 12.) This suggests that Daija's § 1983 claims rest upon the Fourth Amendment prohibition against unreasonable seizures. And, to be sure, the Supreme Court has recognized that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968); *see also Burchett*, 310 F.3d at 942. Under this definition, Daija King was "seized" when Defendants insisted that she remain with her mother as the latter was arrested and detained in a motel room. Daija was not free to remain at home or to walk away from the motel — to the contrary, the record suggests that Defendants actively opposed any effort to release Daija from their custody into the care of a third party.

Yet, other cases tend to place a different constitutional gloss upon Daija King's claims in this case. In *Davis v. Brady*, 143 F.3d 1021, 1024-26 (6th Cir. 1998), for example, we held that a Fourteenth Amendment substantive due process violation can occur when the State takes an individual into its custody and then fails to adequately ensure her safety and well-being. In so ruling, we relied in part on the decision in *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 109 S. Ct. 998 (1989), in which the Supreme Court explained:

> [W]hen the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty

> that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.,* food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty — which is the "deprivation of liberty" triggering the protections of the Due Process Clause . . . .

*DeShaney*, 489 U.S. at 199-200, 109 S. Ct. at 1005-06 (citations and footnote omitted). These principles seemingly are implicated here, where Defendants restrained Daija's freedom to act on her own behalf or to secure the assistance of a substitute caregiver in providing for her basic needs.

In the end, however, the outcome is the same whether we analyze Daija King's allegations under Fourth Amendment or substantive due process standards. Under the Fourth Amendment, Daija's seizure must not have been "unreasonable," with the proper measure of unreasonableness depending upon the type of seizure. Thus, if Daija was arrested, as Plaintiffs argue, Defendants' action must have been supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 207-08, 99 S. Ct. 2248, 2253-54 (1979). No one seriously contends that Defendants had probable cause to arrest Daija.

Yet, not all seizures are tantamount to arrests sustainable only upon probable cause. *See Michigan v. Summers*, 452 U.S. 692, 696-97, 101 S. Ct. 2587, 2590-91 (1981); *Dunaway*, 442 U.S. at 208-10, 99 S. Ct. at 2254-55. In cases

of suspected child abuse or neglect, for example, the courts have held that a caseworker may remove a child from her home upon a reasonable belief that the child is in imminent danger of harm. *See*, *e.g.*, *Doe v. Texas Dep't of Protective & Regulatory Services*, 299 F.3d 395, 407 (5th Cir. 2002); *Brokaw v. Mercer County*, 235 F.3d 1000, 1010-11 (7th Cir. 2000). As another example, the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant. *See Summers*, 452 U.S. at 705, 101 S. Ct. at 2595; *Burchett*, 310 F.3d at 942-43; *see also United States v. Enslin*, 327 F.3d 788, 797 n.32 (9th Cir. 2003) (finding that *Summers* applies in the context of arrest as well as search warrants).

Unfortunately, the present case does not fit neatly within any of these recognized analytical frameworks. Plainly, Daija King was not held on suspicion of any criminal activity. Nor, in contrast to the child abuse and neglect cases, did Defendants seize Daija out of a belief that she faced an imminent danger of harm in her home. Neither can it be said that Daija was detained in order to "facilitate[] the orderly completion of" Mary Cherrington's arrest and "minimize[] the risk of harm to officers and others" as they carried out this arrest. *Burchett*, 310 F.3d at 943. Rather, Daija King was taken along with her mother because the arresting officers deemed it inappropriate to leave the two-year-old child alone at home, and because they either failed to identify or declined to pursue other options for ensuring Daija's safety and well-being following her mother's arrest.

Lacking any direct guidance on the legal inquiry that might govern such a situation, the District Court assessed Defendants' conduct under a general standard of reasonableness. (*See* District Court Op. at 5-6, J.A. at 715-16.) This approach comports with the Supreme Court's general instruction that, in cases involving seizures short of a traditional arrest, the courts should be guided by "the ultimate standard of reasonableness embodied in the Fourth Amendment." *Summers*, 452 U.S. at 699-700, 101 S. Ct. at

2593 (footnote omitted); *see also Terry*, 392 U.S. at 19, 88 S. Ct. at 1878-79 (describing the "central inquiry under the Fourth Amendment" as "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security").

At least one other court has employed this same "reasonableness" inquiry under facts similar to those presented here. In *Matheny v. Boatright*, 970 F. Supp. 1039, 1041 (S.D. Ga. 1997), the defendant police officers brought the plaintiff children along as their mother, Angela Matheny, was arrested on drug charges, taken to a detention facility, interrogated, and booked. Matheny alleged that she had sought permission to contact her children's aunt and grandmother to come and take care of the children, but that she was not allowed to make such arrangements until nearly an hour after she arrived at the detention facility. The Court analyzed these circumstances under Fourth Amendment standards, as well as on other grounds, and found that the defendant officers had acted reasonably:

Matheny does not contend that Defendants had any physical contact with the children. Nor does she claim that the children suffered any physical injury inflicted by Defendants. Matheny also does not claim that Defendants directed any harsh or abusive language at the children. In light of the circumstances surrounding Matheny's arrest, namely that her three minor children were present without any other adult present to care for them, Defendants' actions were reasonable. The facts suggest that rather than putting the children at risk, Defendants undertook to care for the children until suitable arrangements could be made for their care.

*Matheny*, 970 F. Supp. at 1046.[4]

We agree with the District Courts here and in *Matheny* that Fourth Amendment claims of the sort asserted by Daija King in this case are most appropriately measured against a general standard of reasonableness. Upon performing this inquiry, moreover, we are inclined to agree with the District Court that the conduct of the individual Defendants was reasonable, although we are somewhat hesitant to reach this conclusion as a matter of law. On one hand, Daija was just two years old at the time, and the officers obviously had to make some sort of arrangement for her care as they placed her mother under arrest; the child plainly could not have been left alone and unsupervised at home. The options, then, were either to keep Daija with her mother or to arrange for Daija to be placed with a relative, family friend, or a state social service agency — and, given the late hour of Mary Cherrington's arrest, the latter might well have proved difficult. So long as Mary Cherrington remained in a hotel room rather than a detention facility, and generally remained available to care for Daija's needs, we cannot say that one course of action was manifestly preferable to the other. In addition, Defendants note that their chosen course served the law enforcement objective of

---

[4]To similar effect, the District Court cited the decision in *Caplan v. Roseman*, 667 F. Supp. 549 (N.D. Ohio 1987), in which a divorced father complained that his and his son's constitutional rights were violated when the defendant police officers prevented him from taking his child on an out-of-state vacation. The officers had been told that this out-of-state trip would violate a court-ordered visitation schedule, and the legal documents produced by the father failed to persuade them otherwise. In holding that the defendant officers were entitled to qualified immunity, the Court reasoned that "police officers in domestic relations situations must make spontaneous decisions based on incomplete, and sometimes inaccurate, information," and found that "[a]ll § 1983 requires in these matters is for police officers to act reasonably and to do the best job possible under difficult circumstances." *Caplan*, 667 F. Supp. at 554. *Caplan*'s analysis, however, does not rest upon grounds of Fourth Amendment reasonableness, but rather upon the "objective reasonableness" standard incorporated within the qualified immunity doctrine.

preserving the secrecy of their ongoing undercover operation. On the other hand, Mary Cherrington testified that the Defendant officers used Daija as a tool to secure her cooperation. This testimony, if believed and found to rest upon more than Cherrington's own speculation,[5] would tend to cast doubt on the reasonableness of Daija's detention.

---

[5]Although Plaintiffs contend in their brief on appeal that Defendant Skeeter confirmed this questionable motive at his deposition, this is not an accurate characterization of the record. Skeeter testified that Cherrington was "allowed . . . to keep Daija" immediately following her arrest while she decided whether to cooperate with the authorities, and that "[a]ll I was doing" at that point was "transporting [Cherrington and Daija] to the people who were making the decisions" regarding Cherrington's possible cooperation. (Skeeter Dep. at 90, J.A. at 154.) He further testified that, prior to the night of Cherrington's arrest, he had spoken to Chief Kinney regarding what to do with Daija, and that he had expressed a concern during that conversation that it might "jeopardize[] the whole investigation, not just getting the cover blown but officer safety as well," if Daija were taken to a social services agency or placed in the care of a friend or relative. (*Id.* at 90-91, J.A. at 154-55.) Skeeter reasoned that such an outside party "would have to know or want to know what was going on," and that "Circleville is a close community" in which news of the undercover investigation would quickly spread. (*Id.* at 91, J.A. at 155.)

Indeed, even Cherrington's own testimony on this point is less than definitive. She testified that while she was still in her apartment immediately following her arrest, Skeeter threatened that she would "lose my child . . . [and] lose my home" if she did not cooperate with the authorities. (Cherrington Dep. at 73, J.A. at 269.) Cherrington further stated that Skeeter repeated this threat after they arrived at the hotel. (*Id.* at 94, J.A. at 290.) She then testified that she agreed to cooperate because "[t]hey had my child, and I didn't want to lose her." (*Id.* at 106, J.A. at 302.) Thus, while Cherrington might well have drawn a connection in her own mind between Daija's presence at the hotel and her decision to cooperate with the authorities, nothing she was told expressly forged this link, and the individual Defendants did not acknowledge this motive at their depositions. Rather, from all that appears in the record, and from all that Cherrington states she was told at the time, Skeeter might have employed the very same threats even if Daija had not been kept with her mother, but instead had been placed with an agency or taken to the home of a friend or relative.

Yet, it ultimately is unnecessary for us to decide whether the individual Defendants did or did not heed the Fourth Amendment command of reasonableness in their conduct toward Daija King, because they are entitled to qualified immunity in any event. As noted, the second prong of the qualified immunity inquiry turns upon whether the defendant has violated "clearly established constitutional rights of which a reasonable person would have known." *Burchett*, 310 F. 3d at 942 (internal quotations and citations omitted). We have explained:

> For a right to be clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Although it need not be the case that the very action in question has been previously held unlawful, . . . in the light of pre-existing law, the unlawfulness must be apparent.

*Burchett*, 310 F.3d at 942 (internal quotations and citations omitted).

As is evident from our foregoing discussion, the pre-existing law is silent on the lawfulness of keeping a young child with her mother while the latter is placed under arrest and held in custody at a location other than a traditional detention facility. If the Defendant officers had scoured the case law at the time (or even to this day), they could not have located a decision indicating that Daija King's Fourth Amendment rights might be violated if she were taken with her mother to a hotel for about a 24-hour period while Mary Cherrington cooperated with the authorities by attempting to arrange drug purchases. Rather, the most closely analogous case, *Matheny*, leads to the opposite conclusion. Under these circumstances, the individual Defendants are entitled to qualified immunity, because the law did not (and still does not) "clearly proscribe[]" the actions they took. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816 (1985).

We reach precisely the same conclusion upon evaluating Daija King's claims under substantive due process standards. Here, we have somewhat more case law to guide us; several cases, including at least one in this Circuit, have considered the substantive due process implications of a police officer's decision about what to do with children whose parent or custodian has been placed under arrest. *See*, *e.g.*, *Walton v. City of Southfield*, 995 F.2d 1331, 1336-39 (6th Cir. 1993); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1354-55 (7th Cir. 1985); *White v. Rochford*, 592 F.2d 381, 383-86 (7th Cir. 1979); *Matheny*, 970 F. Supp. at 1043-45. Upon reviewing these cases, we conclude that the allegations and evidence in this case are insufficient to establish either a substantive due process violation or a violation of a clearly established constitutional right.

In *Walton*, for example, plaintiff Barbara Walton was driving a car in which her fifteen-year-old daughter and two-year-old granddaughter were passengers. The defendant police officers stopped and approached the car to investigate why the two-year-old was not riding in a proper child-restraint seat. Upon determining that Walton was driving with a suspended license, the officers placed her under arrest. When she asked that the children be placed in protective custody, the officers responded that they could not do so, but suggested that the children could call someone to pick them up. The officers then waited while the children entered a nearby office building to make a phone call, but did not remain on the scene to confirm that they had secured a ride home. In fact, nearly six hours passed before someone finally arrived to pick up the children.

We held that the defendant officers were entitled to qualified immunity on the children's substantive due process claims. We began by noting that the Sixth Circuit had not yet addressed the issue of passenger abandonment by state or local law enforcement officials, but that other Circuits had done so, reaching somewhat different conclusions. In addition, while cases such as *White*, *supra*, had recognized a

due process protection against police abandonment of passengers upon arresting the driver of a vehicle, we found that *White* was distinguishable as involving abandonment "in a more dangerous situation." *Walton*, 995 F.2d at 1338-39.[6] Accordingly, despite "an exercise of very poor judgment on the part of the defendant police officers," we held that "the 'contours of the [due process] right,' if there is such a right, were not sufficiently clear so that a reasonable officer would have known that leaving the children in the parking lot violated that right." *Walton*, 995 F.2d at 1333, 1339.

Because *Walton* did not decide whether such a substantive due process right exists, it did not reach the issue of the standard by which to judge alleged violations of such a right. We addressed this question in *Davis, supra*, however, holding that "where the plaintiff suffered injury as a result of being placed in the state's custody, it has consistently and uncontroversially been the rule that a constitutional claim arises when the injury occurred as a result of the state's deliberate indifference to the risk of such an injury." *Davis*, 143 F.3d at 1026; *see also Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (applying a deliberate indifference standard to a substantive due process claim). Similarly, the other above-cited child abandonment cases consider whether the conduct of the defendant police officers amounted to "gross negligence" or a "reckless disregard" for the safety of the children. *See Moore*, 754 F.2d at 1355; *White*, 592 F.2d at 385.

Under this standard, we do not believe that the record in this case can be viewed as establishing a violation of Daija King's substantive due process rights. Admittedly, the situation into which she was placed — being taken with her

---

[6]In particular, the children in *White* were abandoned by the side of the road in cold weather. "Under exposure of the cold, the children finally realized that they had no alternative but to leave the car, cross eight lanes of traffic and wander on the freeway at night in search of a telephone." *White*, 592 F.2d at 382.

mother as she was placed under arrest, and being held in a hotel room for a 24-hour period, surrounded by police officers, as her mother cooperated with the authorities by attempting a drug purchase — was not ideal. Yet, given the early-morning hour of Mary Cherrington's arrest, it is not clear that there were any available and preferable alternatives to the course chosen by Defendants. Further, there is no evidence that Daija suffered any harm during this period of detention; at worst, Mary Cherrington's deposition testimony indicates that she and her daughter were fed only once during their 24-hour stay at the hotel. The most that can be said, perhaps, is that the Defendant officers might have been better advised to attempt to arrange for Daija to be picked up by a relative or friend, and that they might have sacrificed a degree of Daija's comfort and emotional well-being in an effort to preserve the secrecy of their still-ongoing undercover operation. This, in our view, is not tantamount to gross negligence or a reckless disregard for Daija's safety.

In any event, as with our Fourth Amendment analysis, we conclude that the individual Defendants are entitled to qualified immunity on the "clearly established" prong of our substantive due process inquiry. Again, we note the utter absence of any case finding a substantive due process violation based upon a police officer's decision to retain custody over a child while her parent or custodian is placed under arrest. To the contrary, the case law suggests that the Defendant officers would more likely have run afoul of substantive due process concerns if they had left Daija King at home or otherwise placed her in a situation which failed to adequately ensure her safety and well-being. Because the pre-existing law would not have alerted the individual Defendants that their conduct might violate Daija King's substantive due process rights, they are entitled to qualified immunity. More generally, in light of our similar conclusion under a Fourth Amendment analysis, we affirm the District Court's dismissal of Daija King's § 1983 claims against the individual Defendants on the ground of qualified immunity.

**C.    Under the Present Record, the Individual Defendants Are Not Entitled to Qualified Immunity on Mary Cherrington's Claim that She Was Denied a Prompt Judicial Determination of Probable Cause.**

Of the various § 1983 claims asserted by Mary Cherrington in the court below, the only one she is pursuing on appeal, against the individual Defendants at least,[7] is her claim that she was not provided with a sufficiently prompt judicial determination of probable cause following her warrantless arrest.  In the lower court, and again on appeal, Plaintiff Cherrington has cited Ohio Rule of Criminal Procedure 4(E)(2) as the source of this claimed right to a prompt probable cause hearing.[8]    The District Court rejected this claim, reasoning that a violation of a state rule of criminal procedure cannot sustain a federal § 1983 claim.  Be that as it may, and fully acknowledging Plaintiffs' rather inarticulate presentation on this point, we readily conclude that Mary Cherrington has stated a viable Fourth Amendment claim as a result of the delay in affording her a probable cause hearing.  We further find that the present record fails to establish as a matter of law that the individual Defendants are entitled to qualified immunity on this claim.

Though Plaintiff Cherrington has mentioned this ruling only in passing, the Supreme Court's decision in *County of*

---

[7]Plaintiffs' claims against the Defendant City of Circleville are addressed below.

[8]At the time of Cherrington's arrest, this Ohio rule provided in relevant part:

> Where a person is arrested without a warrant the arresting officer shall . . . bring the arrested person without unnecessary delay before a court having jurisdiction of the offense, and shall file or cause to be filed a complaint describing the offense for which the person was arrested.

Ohio Crim. R. 4(E)(2) (1997).

*Riverside v. McLaughlin*, 500 U.S. 44, 111 S. Ct. 1661 (1991), provides the basis for her present Fourth Amendment claim.  The Court previously had recognized in *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854 (1975), that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."  In *County of Riverside*, the Court considered just how soon such a determination must be made, and concluded that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*."  *County of Riverside*, 500 U.S. at 56, 111 S. Ct. at 1670.  While a delay of over 48 hours is not *per se* unlawful, the Government bears the burden in such cases to "demonstrate the existence of a bona fide emergency or other extraordinary circumstance" that led to the delayed probable cause determination.  *County of Riverside*, 500 U.S. at 57, 111 S. Ct. at 1670.

In this case, Mary Cherrington was arrested without a warrant in the early morning hours of Saturday, August 30, 1997, but she was not brought before a magistrate for a probable cause determination until about 8:30 a.m. on Tuesday, September 2, 1997.  This delay of over 72 hours significantly exceeded the general 48-hour rule announced in *County of Riverside*.  Absent some "bona fide emergency or other extraordinary circumstance," then, this delay violated Cherrington's Fourth Amendment right to a prompt judicial determination of probable cause.

Neither of Defendants' two proposed "extraordinary circumstances" take this case outside the usual 48-hour rule.  First, Defendants note that their undercover investigation continued after Cherrington's arrest, and that she agreed to cooperate in this ongoing operation by attempting to arrange a drug purchase.  Defendants reason that this undercover effort would have been jeopardized if Cherrington had been brought before a magistrate.  Yet, this undercover operation surely had concluded by Sunday, August 31, 1997 at 3:37 a.m., when Cherrington was taken from the Travel Lodge

motel and placed in jail. Even so, Cherrington was made to wait more than 48 hours *from this point* before a magistrate found probable cause to arrest her. Cherrington's participation in the ongoing investigation, then, did not prevent Defendants from complying with *County of Riverside*'s 48-hour rule.[9]

Next, Defendants point to the intervening weekend and Labor Day holiday between Mary Cherrington's arrest and the magistrate's probable cause determination. *County of Riverside* itself, however, expressly cautions that intervening weekends and holidays do not qualify as "extraordinary circumstances" that permit relief from the 48-hour requirement. *See County of Riverside*, 500 U.S. at 57-58, 111 S. Ct. at 1670-71. Accordingly, this Court recently held that a municipality's "part-time court" scheme, under which "court was never held on weekends or holidays," would "very likely run afoul of the forty-eight hour time limit established in *Riverside"* in cases of warrantless arrests on Friday evenings or Saturday mornings. *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

In sum, the undisputed record establishes a violation of *City of Riverside*'s 48-hour rule, and Defendants have failed to identify any emergency or other extraordinary circumstance that might take this case outside of the general rule. It follows that Plaintiff Cherrington can withstand the first prong of the qualified immunity inquiry by virtue of the violation of her Fourth Amendment right to a judicial

---

[9]We recognize that an individual's agreement to cooperate with the authorities might well be a relevant factor in determining whether a delayed probable cause determination violates the Fourth Amendment. Under the facts of this case, however, we need not decide whether the period of Mary Cherrington's cooperation should be charged against or exempted from the 48-hour limit, or whether her voluntary participation in an ongoing undercover operation constituted an "extraordinary circumstance" which would permit a more lengthy delay in securing a judicial determination of probable cause.

determination of probable cause within 48 hours of her arrest. Her claim also survives scrutiny under the second, "clearly established" prong of the qualified immunity inquiry, because *County of Riverside* itself, a decision which predated Cherrington's arrest by several years, would have alerted a reasonable official to (i) the existence of Cherrington's Fourth Amendment right to a judicial determination of probable cause within 48 hours, and (ii) the unavailability of any "intervening weekend or holiday" exception to this 48-hour rule. Under the present record, therefore, the individual Defendants are not entitled to qualified immunity on Plaintiff Cherrington's Fourth Amendment claim of an excessive delay in the magistrate's determination of probable cause for her arrest.

Nonetheless, we hasten to add that the liability of the individual Defendants is not a foregone conclusion upon remand. Because the District Court determined at the threshold that there had been no constitutional violation, it had no occasion to consider whether the two individual Defendants actually named in the complaint, Andre Skeeter and Chief Kinney, could be held liable for such a violation. Likewise, the parties have not addressed this issue in their briefs on appeal, and the record does not disclose all of the pertinent details of the specific roles played by Defendants Skeeter and Kinney in Mary Cherrington's detention and eventual appearance before a magistrate. Consequently, we are limited to offering only a few general observations that the District Court might wish to consider in any subsequent proceedings.

It is axiomatic, of course, that § 1983 prohibits actions "under color of state law" which deprive an individual of a right secured by the U.S. Constitution or a federal statute. *See, e.g., Cassady v. Tackett*, 938 F.2d 693, 695 (6th Cir. 1991). "Thus, before a defendant may be held liable under section 1983, that defendant must first *possess* power by virtue of state law, then *misuse* that power in a way that violates federal constitutional rights." *Christian v. Belcher*,

888 F.2d 410, 414 (6th Cir. 1989). In the present context, this means that we must look to state law to determine who is responsible for ensuring that a judicial determination of probable cause is made within 48 hours after an arrest.

Under Ohio law, where an arrest is made without a warrant, it generally falls to the "arresting officer" to "bring the arrested person without unnecessary delay before a court having jurisdiction of the offense." Ohio Crim. R. 4(E)(2). In this case, the record establishes that Defendant Skeeter was one of the arresting officers, and there is some evidence of Defendant Kinney's involvement in the decisions to arrest Mary Cherrington and initially take her to a motel rather than the Circleville police station. The record is almost entirely silent, however, as to the roles played by these Defendants or other law enforcement officials in the roughly two-and-a-half-day period that Cherrington remained in jail without being brought before a magistrate.

Under this record, it is possible that either or both of the named Defendants had a duty under Ohio law to see that Cherrington was promptly brought before a magistrate for a determination of probable cause to arrest her, and that either or both failed to take the necessary steps to discharge this obligation. It is equally possible, however, that one or both of these Defendants took some steps to ensure that there was a prompt judicial determination of probable cause, but that, through no fault of their own, this did not occur. In other words, we lack the information necessary to resolve the issue of causation — namely, whether the delay in Mary Cherrington's probable cause determination was attributable to the actions (or inaction) of one or both of the named Defendants. *See*, *e.g.*, *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999) (addressing this question of causation in the specific context of a claimed violation of *County of Riverside*'s 48-hour rule); *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1478-79, 1481-82 (9th Cir. 1993) (same); *Strepka v. Miller*, No. 00-1294, 2001 WL 1475058, at *3 (10th Cir. Nov. 21, 2001) (same). *See generally Gazette v.*

*City of Pontiac*, 41 F.3d 1061, 1066 (6th Cir. 1994) (addressing the proximate cause element of a § 1983 claim). This matter must be determined upon remand to the District Court.

**D.   Under the Present Record, the Defendant City Is Not Entitled to Summary Judgment on Plaintiff Cherrington's *County of Riverside* Claim.**

As their final issue on appeal, Plaintiffs challenge the District Court's award of summary judgment to the Defendant City of Circleville on their § 1983 claims. Although this sweeping challenge largely fails to withstand scrutiny, we find that this grant of summary judgment must be reversed in one limited respect — namely, as it relates to Plaintiff Cherrington's claim of undue delay in the judicial determination of probable cause to arrest her. With this lone exception, we affirm the District Court's rulings as to the Defendant City.

A municipality cannot be held vicariously liable under § 1983 for the acts of its employees or agents. *See Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978); *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). Rather, municipal liability attaches only where a constitutional violation results from the "execution of a government's policy or custom." *Gregory*, 220 F.3d at 441. Beyond having to identify "conduct properly attributable to the municipality" itself, a plaintiff

must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

On appeal, Plaintiffs contend that the requisite municipal policy or custom can be found in the Defendant City's alleged failure to properly train its officers, and particularly Defendant Skeeter. The Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388, 109 S. Ct. at 1204 (footnote omitted). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." 489 U.S. at 389, 109 S. Ct. at 1205.

In an effort to establish their "failure to train" theory, Plaintiffs cite evidence tending to indicate that Defendant Skeeter received little or no instruction or guidance regarding Circleville police department policies and procedures. Be that as it may, however, Plaintiffs notably fail to specify exactly **which** constitutional injuries might have resulted from this lack of training, nor have they pointed to evidence in the record that might tend to establish a direct causal link between Skeeter's allegedly deficient training and a particular constitutional injury suffered by either Daija King or Mary Cherrington. We decline Plaintiffs' invitation to engage in a generalized, open-ended inquiry whether a lack of proper training could have been the "moving force" behind **some** constitutional violation that might be gleaned from the record before us. Rather, absent any specific guidance from Plaintiffs on this point, we limit our consideration of the

City's potential liability to the two alleged violations expressly raised on appeal — namely, the allegedly unlawful detention of Daija King incident to her mother's arrest, and the violation of Mary Cherrington's right to a prompt judicial determination of probable cause.

As to Daija King's constitutional claims, we readily conclude that the evidence is insufficient as a matter of law to forge the requisite causal connection between her allegedly unlawful detention and any inadequacy in the training of the Defendant City's police officers. To be actionable, a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992). We have read *City of Canton* as recognizing at least two situations in which inadequate training could be found to be the result of deliberate indifference. "One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction," as would be the case, for example, if a municipality failed to instruct its officers in the use of deadly force. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999). "A second type of situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Brown*, 172 F.3d at 931.

The detention of Daija King incident to her mother's arrest does not remotely fit into either of these established categories of actionable failures to train. Given the dearth of case law addressing the issue, it cannot be said that police officers routinely confront the question of what to do with children upon arresting their parent or guardian. Thus, the Defendant City cannot be deemed deliberately indifferent to

an obvious need for officer training in this area.[10] Likewise, Plaintiffs have failed to identify any similar incidents or prior complaints that might have alerted the Defendant City to the need to cover this topic in its officer training. Absent some form of notice that its officers might confront such a situation, the Defendant City cannot be held liable under a "failure to train" theory for any alleged deprivation of Daija King's constitutional rights. *See Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 912 (6th Cir. 1995) (citing lack of notice as a basis for rejecting a claim of inadequate training).

Matters are somewhat different with regard to Mary Cherrington's claim of an unduly delayed judicial determination of probable cause for her arrest. It surely is foreseeable that the Defendant City's police officers will occasionally make warrantless arrests, and thus will require instruction on the need to ensure that individuals arrested without a warrant are brought before a magistrate within 48 hours for a probable cause determination. Moreover, Plaintiffs have pointed to Defendant Skeeter's testimony that he generally did not receive ***any*** instruction regarding ***any*** Circleville police department policies or procedures. (*See* Skeeter Dep. at 49-50, J.A. at 114-15.) Under this record, a trier of fact could conclude that the Defendant City's training of Skeeter was "inadequate to the tasks that officers must perform," and that this inadequacy reflected the City's "deliberate indifference" to the Fourth Amendment rights of

---

[10]Indeed, in the event that a municipality found it appropriate to offer training on this subject, it would be difficult to glean any general rule from the existing precedents — it might be better to place the child with a social service agency in one case, with a relative in another, or to keep the child with her parent in still another. Even in the specific case now before us, we have hesitated to conclude that one course of action would have been constitutionally preferable to the others. Given the limited utility of such nebulous "training," a municipality could hardly be said to be deliberately indifferent to the needs of its citizens if it chose to forgo this instruction.

those who come in contact with the Circleville police. *Russo*, 953 F.2d at 1046 (internal quotations and citations omitted).

Nonetheless, this still leaves the question whether this inadequate training was "closely related to" or "actually caused" a violation of Mary Cherrington's Fourth Amendment right to a prompt judicial determination of probable cause. *Russo*, 953 F.2d at 1046 (internal quotation marks and citations omitted). As noted earlier, we are severely handicapped in our effort to determine the root cause of this violation or the principal players involved, because the record is nearly silent as to what occurred or who was present during Cherrington's detention at the Circleville police station. For all we can tell, then, Defendant Skeeter was fully aware of the need for a prompt probable cause determination, yet was assured by other officers at the station that they would discharge this duty. Alternatively, given Defendants' appeal to the intervening weekend and Labor Day holiday between Cherrington's arrest and her appearance before a magistrate, it is possible that the Defendant City failed to provide the necessary resources to ensure that individuals arrested without a warrant in the early part of a weekend need not wait until the following Monday (or Tuesday) for a probable cause hearing. In this event, the City's liability would rest directly upon an unconstitutional policy rather than inadequate training — even the most extensive training program could not overcome the brute fact that a magistrate was not available on weekends and holidays.[11]

In light of this evidentiary gap on a material issue, we cannot say as a matter of law that the Defendant City is not liable for the deprivation of Plaintiff Cherrington's Fourth Amendment right to a prompt judicial determination of

---

[11]Our discussion on this subject is not meant to exhaust all of the possible factual scenarios that might have led to the delayed probable cause determination in this case. We merely mean to emphasize that the record tells us nothing about what actually occurred.

probable cause.  Just as we have remanded the matter of the individual Defendants' liability under this theory, we invite the parties to address the City's liability on remand to the District Court.  Admittedly, to this point, Plaintiffs have done very little to meet their burden of establishing a factual basis for holding ***any*** of the Defendants liable for this Fourth Amendment violation.  Yet, because the first round of District Court proceedings focused largely on the wrong issue — namely, the legal significance of Ohio Rule of Criminal Procedure 4(E)(2) to Plaintiff Cherrington's federal constitutional claim, rather than the Supreme Court's ruling in *County of Riverside* — we believe it appropriate to afford Plaintiffs a limited opportunity to develop a factual record supporting the imposition of liability on one or more of the Defendants, whether individual or municipal, for violating *County of Riverside*'s 48-hour rule.  At the same time, Defendants can attempt to identify an "extraordinary circumstance" that might exempt them from the operation of this rule.

### III.  *CONCLUSION*

For the reasons set forth above, we REVERSE the rulings of the court below on Plaintiff Mary Cherrington's Fourth Amendment claim of undue delay in the judicial determination of probable cause for her arrest, AFFIRM as to the remaining issues raised on appeal, and REMAND for further proceedings consistent with this decision.