NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0324n.06

Case No. 12-4389

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| NASIR OCEAN, JR., | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

O P I N I O N

BEFORE:  SILER, MCKEAGUE, and WHITE, Circuit Judges.

**McKeague, Circuit Judge.**  This case turns on whether officers' moving an individual from an apartment hallway into a nearby bedroom to question and identify her in the context of the execution of an arrest warrant for another occupant of the apartment constitutes an "unreasonable search" or otherwise violates the Fourth Amendment.  If it does, then a gun discovered in "plain view" by the officers during that questioning should be suppressed. Appellant Nasir Ocean, Jr. argues that the decision of the officers to privately talk to a person in the apartment bedroom who may be a potential witness is not an exception to the searches protected by the Fourth Amendment.  As appellee, the U.S. government counters that the limited detention of the potential witness under the circumstances presented by this case was

permissible, and that discovery of the gun therefore falls within the plain view exception under the Fourth Amendment. The district court determined that the officers' leading the individual to the bedroom for questioning was reasonable, that the government met its burden to show that the officers' actions did not constitute a search which would trigger the protections of the Fourth Amendment, and that the officers' testimony concerning this sequence of events was credible. We affirm.

## I.

In August 2011, Detective David Carpenter investigated a suspected drug dealer with the assistance of a confidential informant. On November 3, 2011, Detective Carpenter identified the suspect as Nasir Ocean, Jr., who had outstanding warrants for drug trafficking and a probation violation involving possession of a gun. Detective Carpenter enlisted the help of the U.S. Marshals and obtained an arrest warrant for Ocean for drug trafficking. Detective Carpenter also obtained a search warrant for an apartment where he had observed a controlled drug purchase involving Ocean. In anticipation of executing these warrants, Detective Carpenter reviewed Ocean's criminal history, which included numerous drug and weapon offenses as well as convictions for assault and failure to comply with officers.

On November 16, 2011, Detective Carpenter and the officers executed the warrants, but found that Ocean was not at the apartment for which they had the search warrant. The officers quickly learned, however, that Ocean was nearby at the apartment of his girlfriend, Kalianna Tucker.[1] When the officers knocked on the door, Tucker was reluctant to open it, but did so

---

[1] The briefs are somewhat inconsistent as to whose apartment it was. The government's brief stated that Tucker "did not live at the apartment" (which implies that it was not her apartment) and yet Ocean's brief says that the apartment belonged to Ocean's girlfriend (which implies that it belonged to Tucker). Regardless, identifying the leaseholder to the apartment does not affect the outcome of this case.

"eventually." When asked if Ocean was present in the apartment, Tucker said no. When the officers realized that Ocean was indeed inside Tucker's apartment, the officers called out to him, and eventually arrested him when he came out from a "backroom or a bedroom" into the hallway.[2]

Between the parties' disagreements and the inconsistencies in Tucker's testimony, the sequence of events is not perfectly clear. According to the government, Detective Carpenter entered the apartment 60 to 90 seconds after the first group of officers. Tucker's apartment consisted of a hallway, a kitchen and a bathroom on the right side of the door of entry, "and then a bedroom a little further down the hallway, and then, beyond the bedroom is . . . a living room."[3] Mot. Hr'g Tr. at 20, PageID # 193. The officers handcuffed Ocean in the hallway and removed articles from his pockets and person. Either concurrent with or immediately subsequent to Ocean's arrest, the officers conducted a search of the apartment, characterized as a "protective sweep," but during the protective sweep the officers did not search the bedroom. The officers discovered cocaine in the bathroom toilet.

The circumstances leading to Tucker's questioning are disputed by the parties. Although Tucker was in the bedroom at the time of Ocean's arrest, she came out into the hallway at some point and was in close proximity to Ocean. According to the government, Tucker (who was cooperative) was led back into the bedroom in order both to take her out of sight and earshot of Ocean and to ensure that the officers could question and identify Tucker in a safe manner. According to Ocean, Tucker was moved or taken from the hallway into the bedroom for

---

[2] Tucker at one point gave testimony that the officers did not call out to Ocean, and that the officers found Ocean in the bedroom. The district court did not credit this testimony. The district court also did not credit Tucker's testimony that she was in the outside hallway—outside the front door of the apartment—until the officers brought Ocean out.

[3] One marshal, Anthony Gardner, described the hallway as maybe four to five feet wide.

questioning, or detained and marched into the bedroom. At or around this time, officers spotted a firearm in plain view on the closet floor that was either next to or partially obscured by a pile of clothes in the closet. Approximately thirty seconds to a minute passed between Detective Carpenter's entering the bedroom and his observing the handgun.[4] Tucker initially equivocated but later admitted that she had known about the gun. She also admitted that Ocean was the owner of the gun. Ocean was charged with felony possession of a firearm.

On June 26, 2012, the U.S. District Court for the Northern District of Ohio heard Ocean's motion to suppress the gun found in the bedroom. Mot. Hr'g Tr. at 3, PageID # 176. The district court denied the motion while acknowledging not only the differences between the government's and Tucker's testimonies but also its "concern about . . . some of the details" of the officers' version of the events.[5] *Id.* at 76–77, PageID # 249–50. However, the district court discredited Tucker's testimony, saying that Tucker "lied right off the bat," "backtracked immediately" when caught, and was not "credible at all." *Id.* at 76, PageID # 249. The district court also noted that Tucker clearly had a "motive" to misrepresent the truth not only because she was Ocean's girlfriend but also because she too was in custody, facing prosecution for two drug charges. *Id.* at 77, PageID # 250. The district court found the government's testimony more credible and ruled that "the gun was seen in plain view" when the officers led Tucker into the bedroom for questioning. *Id.* ("That doesn't sound like a search.").

The district court further determined that it was reasonable for the officers to take Tucker for questioning into a room where Ocean was not present, especially after she had lied to them

---

[4] Ocean notes that the government's witnesses contradicted each other on the issue of which government official discovered the gun.

[5] In particular, the district court determined that a police report describing, among other things, how the officers engaged in a protective sweep, was "inaccurate in certain ways in the way it describes the events." *Id.* at 76, PageID # 249.

about Ocean's being in the apartment. *Id.* at 77–78, PageID # 250–51. The district court did not consider it dispositive that the room selected by the officers to talk to Tucker was the bedroom, and not the bathroom or kitchen, and held that the officers did not conduct a search. *Id.* Consequently, the district court found that the government met its burden to show that the officers' actions did not constitute a search which would trigger the protections of the Fourth Amendment and denied the motion to suppress. *Id.* at 78, PageID # 251. This appeal followed.

**II.**

This court reviews the district court's denial of a motion to suppress for clear error with respect to findings of fact and *de novo* with respect to conclusions of law. *United States v. Lattner*, 385 F.3d 947, 952 (6th Cir. 2004) (Siler, Rogers, <u>Forester</u>); *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (Nelson, Siler, <u>Clay</u>). A factual finding is clearly erroneous only when, having reviewed all evidence in its entirety, the court comes to the "definite and firm" conclusion that the district court erred. *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (Wellford (concurring), <u>Boggs</u>, Moore (concurring in the result only)) (citing *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993) (Ryan, <u>Siler</u>, Lively)). This court reviews evidence "in the light most likely to support the district court's decision." *Id.* (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) (Boggs, <u>Siler</u>, Churchill)) (internal quotation marks omitted).

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Id.*

(internal quotation marks omitted) (quoting *United States v. Jones*, 132 S. Ct. 945, 950–51, n.3 (2012)). While the Fourth Amendment guarantees the right to be free from warrantless searches, there are well-established exceptions in which the government may obtain evidence without a search warrant. *See United States v. Taylor*, 248 F.3d 506, 511 (6th Cir. 2001) (Krupansky, Batchelder, Gilman). Under the plain view exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (internal quotation marks omitted). Put differently, the plain view exception applies when three conditions are met: "(1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed, (2) the item is in plain view, and (3) the incriminating character of the evidence is immediately apparent." *Taylor*, 248 F.3d at 512 (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

Applying this standard reveals the central issue in this case. Ocean does not dispute the second condition that the gun was in plain view when the officers observed its barrel sticking out of a pile of clothes in the closet in the bedroom. Furthermore, there is no serious question about the third condition, concerning the incriminating character of the gun. *See id.* At issue is whether the officers' entry into the bedroom—"where the evidence could be plainly viewed" and where the gun was discovered—was permissible. *See id.* More important is whether the district court's ruling that the discovery of the gun was constitutionally permissible satisfies the clear error standard. *See Miggins*, 302 F.3d at 397.

Ocean advances three arguments to support his claim that the first condition was not met and that his constitutional rights were therefore violated. First, Ocean argues that the officers'

moving Tucker and entering the apartment bedroom itself constituted an impermissible search under the meaning of the Fourth Amendment. Second, Ocean argues that the search of the bedroom cannot be justified as a "protective sweep." Third, Ocean argues that the search of the bedroom cannot be justified by claiming that Tucker consented to the search. The government counters that moving Tucker into the bedroom was a reasonable detention of a resident occupant during the execution of an arrest warrant for the purposes of identification and officer safety, meaning that the officers' presence in the bedroom was lawful.

The case law weighs in favor of the government's position and supports the district court's decision. Even if moving Tucker and entering the bedroom was not properly characterized as a "protective sweep," it would still be reasonable under this court's precedent, and the district court's ruling would certainly not be clearly erroneous, *see Cherrington v. Skeeter*, 344 F.3d 631, 639 (6th Cir. 2003) (Moore (concurring in the result only), Gilman, <u>Rosen</u>) (discussing a "general standard of reasonableness" in the context of Fourth Amendment claims). In *Michigan v. Summers*, the Supreme Court held that when officers are executing a search warrant, they may detain an occupant of the premises being searched. 452 U.S. 692, 702, 705 (1981). The Court specified that "minimizing the risk of harm to the officers" and facilitating "the orderly completion of the search" can serve to justify detention. *Id.* at 702–03. Also, in *Muehler v. Mena*, the Court discussed *Summers*, noting that "detentions are appropriate . . . [when] the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." 544 U.S. 93, 98 (2005). Using these cases as a guide, the officers—pursuant to the execution of an arrest warrant for an occupant of the apartment—imposed the slight intrusion of leading Tucker into the adjacent bedroom for the purposes of officer safety, efficient processing of an arrest, and basic information gathering. *See*

*id.* These cases counsel in favor of determining that leading Tucker away from Ocean met a "general standard of reasonableness" threshold. *Cherrington*, 344 F.3d at 639.

Arguing otherwise, Ocean notes that individuals have a general right to privacy in their homes and bedrooms, and that warrants are generally required unless an exception applies. Ocean also correctly notes that there "is no we wanted to talk to a potential witness alone" exception to the Fourth Amendment's prohibition against warrantless searches. But he neglects the fact that the officers' entry into the bedroom in order to question and identify Tucker was reasonable given the circumstances, which places the discovery of the gun within the bounds of the well-established plain view exception to the general requirement to obtain a search warrant. *See Cherrington*, 344 F.3d at 639; *see also Taylor*, 248 F.3d at 511 (discussing the plain view exception's three conditions). Moreover, even if we were to agree with Ocean that a search occurred, an alternative ground on which we could affirm the district court's denial of the motion to suppress is that Tucker was cooperative and consented to entering the bedroom with the officers. The district court observed the complete lack of "testimony that [Tucker] was dragged or forced into the bedroom" or "dragged or pushed anywhere[,]" and this determination would survive a clearly erroneous standard of review on appeal. *See* Mot. Hr'g Tr. at 78, PageID # 251.

Ocean's other arguments are also not supported by the case law. While Ocean argues that *Summers* and *Muehler* are distinguishable on the basis that the search warrant procured by the officers was not for the apartment where the officers arrested Ocean and discovered the gun, this argument does not help him because the officers had an arrest warrant for Ocean, which permits limited detention to further governmental interests, *see generally Muehler*, 544 U.S. at 98–99 (finding that the "use of force in the form of handcuffs to effectuate . . . detention . . . [was] reasonable because the governmental interests outweigh[ed] the marginal

intrusion"). This is because this court held that the limited detention rule specified by the Supreme Court in *Summers* applies to the execution of arrest warrants in addition to search warrants. *See Cherrington*, 344 F.3d at 638 ("[T]he police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant." (internal citations omitted)). Moreover, Ocean's reliance on *Florida v. Jardines*, 133 S. Ct. 1409 (2013), is misplaced. In *Jardines*, the Court held that the searching done by a drug-sniffing dog in the curtilage of a home without either a search or arrest warrant was a violation of the Fourth Amendment. *Id.* at 1413–15. By contrast, the government had an arrest warrant for Ocean, which makes *Jardines* of limited help to Ocean. *See id.*

For several reasons, the district court's acceptance of the government's arguments was not clearly erroneous. First, the district court's not finding Tucker "credible at all" because she "lied right off the bat" and "backtracked immediately" is fully supported by the record. Mot. Hr'g Tr. at 76, PageID # 249. Second, the officers were processing or arresting Ocean in a narrow hallway when Tucker exited the bedroom and moved toward Ocean. The officers moved Tucker into the bedroom to avoid any contact between her and Ocean, which the district court found was "reasonable" and not in and of itself a "search[,]" *id.* at 77, PageID# 250. This finding cannot be fairly described as clearly erroneous under the case law described above. Finally, the government argues that leading Tucker from the hallway and into the bedroom was appropriate for officer safety, especially given that the officers did not trust Tucker due to her lying about Ocean's presence at the apartment. The district court did not focus on this argument during the hearing, but did accept the government's version of events as credible. This concern of officer safety would also support the district court's decision under a clear error standard.

**III.**

The officers' removal of Tucker from the hallway into the apartment bedroom was reasonable under the circumstances, meaning the officers' presence in the bedroom was lawful, and allowing the discovery of the gun to fall within the plain view exception. For the reasons listed above, we affirm the district court's denial of the motion to suppress.

**HELENE N. WHITE, Circuit Judge**, concurring.  The majority finds that the officers'

entry into the bedroom met a "general standard of reasonableness" threshold under the Fourth

Amendment, and therefore, was not an unconstitutional search.  I am sympathetic to the basic

premise of the majority's opinion—officers lawfully conducting an in-home arrest should be able

to take reasonable measures to secure the scene, and stepping with Tucker into the bedroom was

reasonable.  I write separately, however, because it was nonetheless a Fourth Amendment search

and, I believe, should be assessed under case law applicable to searches.

The majority relies on *Michigan v. Summers*, 452 U.S. 692 (1981), and *Cherrington v.*

*Skeeter*, 344 F.3d 631 (6th Cir. 2003), to reach its decision.  Both decisions address the

constitutionality of *detentions*, not *searches.*  *Summers* held that officers may detain occupants of

a residence during the execution of a search warrant.  *Summers*, 452 U.S. at 702.  *Cherrington*—

a 42 U.S.C. § 1983 case addressing the alleged seizure of an arrestee mother's two-year-old

child—cited *United States v. Enslin*, 327 F.3d 788, 797 n.32 (9th Cir. 2003), for the proposition

that *Summers* permits the detention of occupants during the in-home execution of *arrest*

warrants, as well as search warrants.  *Cherrington*, 344 F.3d at 638.  Neither *Summers* nor

*Cherrington* holds, as the majority opinion concludes, that the authority to detain occupants

during the in-home execution of an arrest warrant carries with it the authority to enter areas of

the home that are otherwise constitutionally off-limits.

Established precedent applicable to *searches* is, I think, both more responsive to the

officers' conduct and adequate to assess its constitutionality.  Without regard to the purpose for

their entry, the officers' entry into the bedroom constituted a Fourth Amendment search.  *See*

*Kyllo v. United States*, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search occurs when the

government violates a subjective expectation of privacy that society recognizes as reasonable.");

*Minnesota v. Olson*, 495 U.S. 91 (1990) (recognizing a reasonable expectation of privacy in one's bedroom). Warrantless searches of the home are "'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Here, the officers had an *arrest* warrant that allowed them to enter the *apartment*. *See United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006) *cert. denied*, 549 U.S. 1283 (2007). But once the officers found Ocean in the hallway, the arrest warrant did not authorize any further search of the apartment. *See El Bey v. Roop*, 530 F.3d 407, 420 (6th Cir. 2008) ("[O]nce the subject of an arrest warrant is found within a home, 'the arrest warrant does not justify a more intrusive search of the premises'") (quoting *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007)).

Officers who enter an apartment to execute an arrest warrant may conduct a "protective sweep" of areas that could harbor an individual posing a danger to those on the arrest scene. *See Maryland v. Buie*, 494 U.S. 325, 335 (1990). Here, however, Gardner and Carpenter—the only officers to testify at the suppression hearing—both stated unequivocally that they were *not* conducting a protective sweep when they took Tucker into the bedroom. And because the government did not contend that officers entered the bedroom during a protective sweep, it never made the showing required to justify one. *Id.* at 334 (requiring a showing of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be searched harbor[ed] an individual posing a danger to those on the arrest scene").

Consent is also a well-recognized exception to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). If Tucker had consented to a search of the bedroom, the constitutionality of the entry would not be in question. But neither officer testified that Tucker was asked for or gave her consent to the officers' entry into the bedroom, and the district court did not find that she consented. The majority notes the district court's observation that no one testified that Tucker "was dragged or forced into the bedroom," but that observation is not the same as a finding that Tucker consented to the search, and in fact, Tucker's mere failure to resist or object when the officers took her into the bedroom is not the legal equivalent of consent. *See United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999) ("'[A]cquiescence cannot, of course, substitute for free consent.'") (quoting *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. 1982)(en banc)); *see also United States v. Most*, 876 F.2d 191, 199 (D.C. Cir. 1989) ("It is clear, however, that for constitutional purposes nonresistance may not be equated with consent.").

That leaves us with the question whether the officers' warrantless search of the bedroom was "reasonable" because exigent circumstances compelled the officers' conduct. *See Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (recognizing an exception to the warrant requirement where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment"). The facts support a finding of exigency here. Ocean was arrested in the narrow front hallway of the apartment. When officers took Tucker into the bedroom, Ocean was still being placed under arrest in the hallway between the kitchen and bathroom doors. Tucker, meanwhile, had disappeared into and then re-emerged from the bedroom, farther down the hall, and at the time the officers stepped back with her into the room was approaching Ocean in the hallway. The officers could reasonably have believed in those circumstances—a hectic arrest scene in close,

unfamiliar quarters—that they needed to quickly remove Tucker from Ocean's vicinity both to prevent injury, because Ocean had not yet been placed in handcuffs and Tucker was moving freely around the apartment, and to preserve evidence, by preventing Tucker and Ocean from communicating. Because Ocean was between Tucker and the front door, stepping into one of the rooms off the hallway was the only viable means of doing so. Accordingly, I would find that exigency justified the search, and I concur in the judgment.