**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0188n.06

No. 18-1927

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**FILED**

Apr 15, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| WESTON RAYFIELD, | ) | |
| | ) | |
| **Plaintiff–Appellant,** | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| CITY OF GRAND RAPIDS, MICHIGAN; | ) | MICHIGAN |
| KENT COUNTY, MICHIGAN; ERIC | ) | |
| HORNBACHER; CRAIG GLOWNEY; | ) | |
| UNKNOWN OFFICER, | ) | **OPINION** |
| | ) | |
| **Defendants–Appellees.** | ) | |

Before: MOORE, SUTTON, and MURPHY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Weston Rayfield appeals the district court's dismissal of his 42 U.S.C. § 1983 action for failure to state a claim. Rayfield brought claims alleging false arrest against the named officers and unlawful detention against the named officers and John Doe. Rayfield also asserts *Monell* liability as to the City of Grand Rapids ("City") and Kent County ("County") based on his prolonged detention—three days—following his warrantless arrest. Because we conclude that the officers had probable cause to arrest Rayfield for violating a Personal Protection Order ("PPO") and because Rayfield's rights regarding his prolonged detention were not "clearly established," we **AFFIRM** the district court's dismissal of Rayfied's false arrest and unlawful detention claims. As for the municipal defendants, because Rayfield's claims against the County and the John Doe County defendants do not relate back to

his original complaint pursuant to Federal Rule of Civil Procedure 15(c), we **AFFIRM** the district court's dismissal of the claims against the County defendants. Finally, because Rayfield's rights regarding his prolonged detention were not "clearly established" in October 2014, we **AFFIRM** the district court's dismissal of Rayfield's *Monell* municipal liability claim against the City.

## I. FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken from Rayfield's amended complaint, as well as from the documents described in Rayfield's amended complaint and attached to the motion to dismiss filed by the City and the named defendants. *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) ("[A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment.").[1]

Rayfield, a self-described artist, author, designer, and business consultant, has been involved in Art Prize, an art festival event in Grand Rapids, Michigan, since 2010. R. 15 (Am.

---

[1]Rayfield contends that the district court, in granting defendants' motions to dismiss, improperly relied upon the contents of a video that Rayfield made prior to his arrest. Although the district court briefly described the contents of the video and noted that, after "actually viewing the video," the video was not the "smoking gun of exoneration that Mr. Rayfield supposes it to be," the district court's resolution of the defendants' motions to dismiss did not ultimately rely upon the contents of the video. R. 39 (Order at 10 n.6) (Page ID #309). Rather, the district court concluded that, because the officers had probable cause to arrest Rayfield and were not required to view the video at all, Rayfield had failed to state a claim for relief. *Id.* at 9–10 (Page ID #308–09). Moreover, the district court explicitly noted that "[t]he Court makes no findings of fact in this Opinion and Order." *Id.* at 2 n.2 (Page ID #301). The district court's statement about the contents of the video is thus more accurately viewed as an extraneous comment, rather than an alternative holding based upon inappropriately viewed evidence.

Compl. ¶ 13) (Page ID #83).[2]  While involved in Art Prize, Rayfield developed a professional and romantic relationship with Susan Smith ("Smith"), who permitted Rayfield to occupy a rental property Smith owned at 1007 Kendalwood in exchange for Rayfield's remodeling assistance.  *Id.* ¶ 15 (Page ID #83–84).  The rental property was divided into two rental units; the upper property was occupied by Nancy Sawinski ("Sawinski").  *Id.* ¶ 18 (Page ID #84).  The two units shared a garage.  *See id.* ¶ 21 (Page ID #85).

In 2014, the relationship between Rayfield and Smith "soured" and Smith subsequently sought to evict Rayfield from the 1007 Kendalwood unit.  *Id.* ¶ 19 (Page ID #84).  When Rayfield resisted the eviction, Sawinski—in an attempt to assist Smith—sought and received a PPO against Rayfield.  *Id.* ¶ 21 (Page ID #85).  The PPO prohibited Rayfield from "approaching or confronting [Sawinski] in a public place or on private property" or "entering onto or remaining on property owned, leased, or occupied by [Sawinski]."  R. 26-1 (PPO at 1) (Page ID #152).  Rayfield contends that there was no basis for the PPO and that, because Sawinski and Rayfield jointly shared the garage, the PPO was difficult to enforce.  R. 15 (Am. Compl. ¶ 22) (Page ID #85).  Additionally, Rayfield asserts that, in an August 30, 2014 police report, the Grand Rapids Police Department documented the fact that Sawinski "admittedly obtained the PPO in an attempt to circumvent the eviction process" and that a PPO "would be virtually impossible to enforce fairly, considering current living arrangements."  *Id.* ¶ 23 (Page ID #85).

---

[2]At the time of the events described in Rayfield's complaint, Rayfield was known as Gary Satterfield.  R. 15 (Am. Compl. ¶ 1) (Page ID #82).  Although Rayfield has since changed his name, the relevant documents referenced in his complaint refer to him as "Gary Satterfield."  *Id.*

On September 17, 2014, Smith filed a complaint for eviction against Rayfield. *Id.* ¶ 24. The complaint and summons were issued on September 22, 2014, with a hearing set for October 2, 2014. *Id.* ¶ 25 (Page ID #85–86). On October 1, 2014, one day before the eviction hearing, Sawkinski "called the Grand Rapids Police pertaining to an altercation with [Rayfield] in the garage of the" property. *Id.* ¶ 26 (Page ID #86). Officers Eric Hornbacher and Craig Glowney responded to the call and ultimately arrested Rayfield for violating the PPO. *Id.* ¶¶ 27–28 (Page ID #86). According to Hornbacher's police report, as quoted in Rayfield's amended complaint, "[b]efore going on scene Officer Glowney and I checked on that PPO and it appeared to still be in place." *Id.* ¶ 28 (Page ID #86). Additionally, although the report indicated that Rayfield told the officers at the scene that he had gone to court the previous day to vacate the PPO, "RADIO confirmed that the PPO was still valid." *Id.* ¶ 29 (Page ID #86). When officers arrived, Rayfield told the officers that he had a video of the incident which showed that Sawinski was the aggressor in the altercation and that Rayfield had not violated the PPO. *Id.* ¶ 31 (Page ID #86). The officers refused to look at the video before arresting Rayfield. *Id.* Finally, Hornbacher's report contains the following language, quoted in Rayfield's amended complaint:

> At this time I am requesting that this PPO be reviewed for possible termination. From the calls for service here since it went into effect Nancy has shown that she is willing to confront and aggravate Gary (and he the same to her). That is not the actions of someone who apparently convinced a judge she feared for her safety (which she claimed to me). If not vacated then maybe an additional provision (such as distance) could be entered to keep the 2 away from each other better that [*sic*] what has taken place so far.

*Id.* ¶ 30 (Page ID #86).

4

"At some point after his arrest," Rayfield's custody was transferred from the Grand Rapids Police Department, i.e., the City, to the County. *Id.* ¶ 33 (Page ID #87). Rayfield contends that his transfer was pursuant to an agreement between the City and the County wherein individuals arrested by the Grand Rapids Police Department "would be housed in facilities controlled and operated by the County of Kent." *Id.* ¶ 34 (Page ID #87). Rayfield asserts that he "was detained for nearly *three days*" and was not released until October 3, 2014, even though he repeatedly told "the persons detaining him at the County of Kent facility" that he needed to be in court for the eviction proceedings on October 2, 2014. *Id.* ¶ 39, 44 (Page ID #88). Rayfield contends that the length of his detention was in violation of Michigan Compiled Laws § 764.15b(2), which requires that an individual arrested for violating a PPO be brought before a court for a hearing within 24 hours following his arrest. *Id.* ¶ 35 (Page ID #87) (quoting Mich. Comp. Laws § 764.15b(2)).[3] Due to his allegedly unlawful detention, Rayfield missed the October 2, 2014 eviction hearing and was later evicted from 1007 Kendalwood. *Id.* ¶¶ 46–48 (Page ID #89).

On September 28, 2017, Rayfield filed a complaint under 42 U.S.C. § 1983, in which he named as defendants the City of Grand Rapids, the Grand Rapids Police Department, Hornbacher, Glowney, and John Doe, who was described as "one or multiple as-yet-unidentified officers, employees, or affiliates of the City of Grand Rapids and/or the Grand Rapids Police Department who were involved in the detention of [Rayfield] from October 1, 2014 through October 3, 2014."

---

[3]Michigan Compiled Laws § 764.15b(2) explains that: "An individual arrested under this section shall be brought before the family division of the circuit court having jurisdiction in the cause within 24 hours after arrest to answer to a charge of contempt for violating the personal protection order."

R. 1 (Compl. ¶ 6) (Page ID #2). The complaint raised four counts: Count I (false arrest in violation of the Fourth Amendment against Hornbacher and Glowney); Count II (unlawful detention in violation of the Fourth Amendment against Hornbacher, Glowney, and Doe); Count III (due process violation against Hornbacher, Glowney, and Doe); and Count IV (municipal liability under the Fourth Amendment against the City of Grand Rapids and the Grand Rapids Police Department).

Pursuant to a stipulation order, R. 9, and following "post-filing discussions and exchange of information" between Rayfield's attorney and the City, Rayfield moved to amend the complaint on January 9, 2018 to add the County as a defendant, R. 11 (Mot. to Amend); R. 15 (Am. Compl.). In the amended complaint, Rayfield removed the Grand Rapids Police Department as a defendant and recharacterized the John Doe defendant as being "one or multiple as-yet-unidentified officers, employees, or affiliates of the City of Grand Rapids and/or the County of Kent who were involved in the detention of Plaintiff from October 1, 2014 through October 3, 2014 or whose actions or failures to act resulted in [the] same." R. 15 (Am. Compl. ¶ 6) (Page ID #82). The amended complaint repeats the same counts enumerated above and contends that both the City and County were liable for Rayfield's extended, three-day detention because neither defendant "provides its police officers with [ ] training as to Michigan law's requirements and timeframes for disposition of a person arrested for a purported PPO violation." R. 15 ¶¶ 89–90 (Page ID #95–96). Rayfield also asserts this detention was in violation of "his constitutional rights." *Id.* ¶ 95 (Page ID #96).

The City and the named officers, as well as the County, subsequently filed motions to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Following

a hearing on the motions, the district court on July 17, 2018 granted the defendants' motions to dismiss all claims. The district court concluded that: (1) the officers had probable cause to arrest Rayfield for violating the PPO and were not required to view the video that Rayfield attempted to show them; (2) Rayfield had not asserted a plausible claim that the officers were responsible for his extended detention; (3) Rayfield's claims against the John Doe defendants and the County were barred by the applicable statute of limitations and did not relate back to the original complaint; and (4) Rayfield had not asserted a plausible *Monell* claim against the City or County. *See generally* R. 39 (Order); R. 40 (Judgment). This timely appeal followed.

## II. STANDARD OF REVIEW

We review de novo a district court's judgment dismissing a case for failure to state a claim under Rule 12(b)(6). *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015). In order to survive a motion to dismiss, a "plaintiff must 'allege facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level."'" *Id.* at 427 (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (alteration incorporated)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on the motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff, accept[ing] its allegations as true, and draw[ing] all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007), *cert. denied*, 552 U.S. 1311 (2008). "The defendant has the burden of showing that the plaintiff has failed to state a claim for relief." *Id.*

## III. DISCUSSION

### A. The Relation-Back Doctrine

As an initial matter, Defendant County asserts that the claims against the County and John Doe County defendants are time-barred, as they were brought more than three years after the events at issue in this case. *See* County Brief at 9. Rayfield concedes that the allegations against the County defendants were technically beyond the applicable three-year statute of limitations because they were first filed in January 2018. Rayfield Brief at 36–37. However, Rayfield contends that, pursuant to Federal Rule of Civil Procedure 15(c), the claims against the County defendants relate back to his original, timely filed, complaint. *Id.* at 36–45. The district court concluded that the claims against the County defendants did not relate back. R. 39 (Order at 15–19) (Page ID #314–18). We review de novo a district court's conclusion that an amended complaint does not relate back to the original complaint. *Durand v. Hanover Ins. Grp., Inc.*, 806 F.3d 367, 374 (6th Cir. 2015).

Under Rule 15(c)(1)(C)

"An amendment to a pleading relates back to the date of the original pleading when: . . . the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Rule 15(c)(1)(B), in turn, requires that "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."

Although Rayfield does not explicitly articulate this, it is clear to us that any claims against the John Doe *City* defendants are not time-barred. Specifically, in Rayfield's original, timely filed complaint, Rayfield identified the John Doe defendants as "one or multiple as-yet-unidentified officers, employees, or affiliates of the City of Grand Rapids and/or the Grand Rapids Police Department who were involved in the detention of Plaintiff from October 1, 2014 through October 3, 2014." R. 1 (Compl. ¶ 6) (Page ID #2). In his amended complaint, Rayfield describes the John Doe defendants as "one or multiple as-yet-unidentified officers, employees, or affiliates of the *City of Grand Rapids* and/or the County of Kent who were involved in the detention of Plaintiff from October 1, 2014 through October 3, 2014 or whose actions or failures to act resulted in [the] same." R. 15 (Am. Compl. ¶ 6) (Page ID #82) (emphasis added). Because both complaints bring claims against some of the same John Doe defendants, i.e., those employed by the City, those claims need not "relate back" to the original complaint. We therefore focus our analysis on the additions of the County and the John Doe County defendants. We conclude that Rule 15(c) does not permit relation back with respect to these claims.

First, we have previously held that Rule 15(c) is inapplicable when the plaintiff seeks to *add*, rather than subtract or change, the named defendants. *See Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir.), *cert. denied*, 519 U.S. 821 (1996) ("Sixth Circuit precedent clearly holds that new parties may not be added after the statute of limitations has run, and [ ] such amendments do not satisfy

the 'mistaken identity' requirement of Rule 15(c)(3)(B)." (citing *In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1449–50 (6th Cir. 1991); *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir. 1973)); *see also Ringrose v. Engelberg Huller Co.*, 692 F.2d 403, 404–05 (6th Cir. 1982) (apparently concluding that the plaintiff was merely correcting a misnomer when the plaintiff added two successor companies once it became clear that the originally named defendant was no longer in business); *cf. Ham v. Sterling Emergency Servs. of the Midwest, Inc.*, 575 F. App'x 610, 615–16 (6th Cir. 2014) (noting that although the plaintiff added the additional doctor defendant without immediately removing the originally named doctor, because "[t]he amended complaint charged Forte 'and/or' Wilson with the same conduct and [the plaintiff] subsequently dropped Forte from the suit[, i]n that sense, [the plaintiff] *changed* the party against whom he brought his claim and did not *add* a new party").

Additionally, our case law suggests that the "mistake" at issue in Rayfield's case—his ignorance of the County's involvement in his detention—is not the type of "mistake" encompassed by Rule 15. *See Brown v. Cuyahoga County*, 517 F. App'x 431, 433–34 (6th Cir. 2013) ("We have previously held that an absence of knowledge is not a mistake, as required by Rule 15(c)(1)(C)(ii)."); *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) (concluding that the plaintiff was not "mistaken" about the proper defendant to name when "he simply did not know whom to sue or opted not to find out within the limitations period"); *Moore v. Tennessee*, 267 F. App'x 450, 455 (6th Cir. 2008) ("In this court, a plaintiff's lack of knowledge pertaining to an intended defendant's identity does not constitute a mistake concerning the party's identity within the meaning of Rule 15(c)." (internal quotation marks omitted)); *but see Ham*, 575 F. App'x at

10

617 (discussing but not deciding whether the plaintiff's mistake about which doctor was actually in charge of his care would constitute the necessary "mistake" under Rule 15).

In response, Rayfield points out that he was unaware of the County's role in his detention only because the City failed to respond promptly and fully to a Freedom of Information Act request prior to Rayfield's filing of the original complaint. Rayfield Brief at 39–40. However, while the City's actions, and Rayfield's resulting confusion, could well form the basis of an equitable-tolling argument, Rule 15(c) is simply inapplicable to this situation. Indeed, we have previously recognized the distinction between Rule 15(c) and equitable tolling. *See Wiggins v. Kimberly-Clark Corp.*, 641 F. App'x 545, 549 (6th Cir. 2016); *Brown*, 517 F. App'x at 433–35 (concluding that although a defendant's refusal to provide information to the plaintiff may form the basis of an equitable-tolling argument, it does not constitute a "mistake" under Rule 15(c)). Rayfield makes no argument, either before this court or the district court, relating to equitable tolling.

For all the reasons set forth above, Rule 15(c) does not save Rayfield's allegations against the County defendants. Rayfield's allegations against the County and John Doe County defendants are thus barred by the three-year statute of limitations. We therefore affirm the district court's dismissal of the County defendants.[4]

---

[4]Moreover, and as explained further below, because Rayfield has failed to state a claim upon which relief may be granted against *all* defendants, Rayfield's allegations also fail on the merits.

**B. Individual Liability Under 42 U.S.C. § 1983**

Rayfield brings three claims against Hornbacher and Glowney, and two claims against John Doe City defendants, in their individual capacities under 42 U.S.C. § 1983.[5] Section 1983 does not create any substantive rights; rather, it is a statutory vehicle through which plaintiffs may seek redress for violations of a right secured by the Constitution or federal laws. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Accordingly, "[a] plaintiff's claim brought under § 1983 requires proof that: (1) the defendant was a person acting under the color of state law, and (2) the defendant deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Fridley v. Horrighs*, 291 F.3d 867, 871–72 (6th Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003). Moreover, the constitutional right must be "clearly established" at the time of the violation so that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal quotation marks omitted), *cert. denied*, 537 U.S. 819 (2002). We now turn to Rayfield's particular claims against the individual defendants.

---

[5]Although Rayfield did not specify in his complaint that he was suing Hornbacher, Glowney, and the John Doe City defendants in their individual, rather than official, capacities, "[w]hen a § 1983 plaintiff fails to affirmatively plead capacity in the complaint, we [ ] look to the course of proceedings to determine whether" the defendants were aware that they were sued in their individual capacities. *Shepherd v. Wellman*, 313 F.3d 963, 968 (6th Cir. 2002) (quoting *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc)). This includes whether the defendants have raised the defense of qualified immunity. *Id.* As Hornbacher and Glowney have both asserted the defense of qualified immunity and consistently responded to Rayfield's complaint in terms of individual liability, *see* R. 26 (Defs.' Mot. to Dismiss Br. at 7) (Page ID #136), we will treat these claims as being against the defendants in their individual capacities.

### 1. False Arrest (Count I)

In his first claim, Rayfield asserts that Hornbacher and Glowney lacked probable cause to arrest him without a warrant for violating the PPO. R. 15 (Am. Compl. ¶¶ 49–58) (Page ID #89–91). In support of his claim, Rayfield points to the fact that: (1) the Grand Rapids Police Department acknowledged in a police report in August 2014 that Sawinski admitted that she had secured the PPO as a way to harass Rayfield and to circumvent the eviction process; (2) Hornbacher stated in his police report following Rayfield's arrest that the PPO was difficult to enforce and that it should be lifted due to Sawinski's repeated "willing[ness] to confront and aggravate" Rayfield; (3) Rayfield had told the officers that he had gone to court to vacate the PPO before his arrest; and (4) the officers refused to look at a video which showed, according to Rayfield, that Sawinski had been the aggressor and that Rayfield had not violated the PPO. *Id.* ¶¶ 23, 30–32, 54–56 (Page ID #85–87, 90). For the reasons set forth below, we conclude that, although the officers should have ordinarily viewed Rayfield's video before arresting him, because the video would not have undermined the existence of probable cause, the district court's dismissal of this claim is affirmed.

#### a. Applicable Law

In order to state a claim for wrongful arrest, Rayfield must show that Hornbacher and Glowney lacked probable cause to arrest him for violating the PPO. *Wesley*, 779 F.3d at 429. "An officer possesses probable cause when, at the moment the officer seeks the arrest, the facts and circumstances within [the officer's] knowledge and of which [she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed

13

or was committing an offense." *Id.* (internal quotation marks omitted) (alterations in original). A probable-cause determination is based on the "totality of the circumstances" and must take into account "both the inculpatory *and* exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Thus, officers "cannot simply turn a blind eye" to exculpatory evidence, *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999), or "ignore information which becomes available in the course of routine investigations," *Fridley*, 291 F.3d at 873. With respect to § 1983 liability, "[i]t is clearly established that arrest without probable cause violates the Fourth Amendment." *Klein*, 275 F.3d at 550 (internal quotation marks omitted).

### b. Rayfield's Arrest

As an initial matter, and putting aside Rayfield's contentions regarding the video evidence, we conclude that Hornbacher and Glowney had probable cause to arrest Rayfield on October 1, 2014. The PPO prohibited Rayfield from "approaching or *confronting* [Sawinski] in a public place or on private property" or "entering onto or remaining on property owned, leased, or *occupied* by [Sawinski]." R. 26-1 (PPO at 1) (Page ID #152) (emphasis added). As Rayfield admitted in his amended complaint, the officers responded to Sawinski's report regarding an "altercation" between her and Rayfield in their shared garage. R. 15 (Am. Compl. ¶ 26) (Page ID #86) ("Sawinski promptly called the Grand Rapids Police pertaining to an altercation with Plaintiff in the garage of the house.").[6] Reasonable officers could conclude that, by engaging in an

---

[6]Although we need not rely on it, we do note that in his police report following the arrest, Hornbacher explained that: "I asked Gary if he confronted Nancy about [a missing electrical cord] and he stated that [he] had and had video taped it. When asked where he was when he confronted Nancy[,] Gary pointed to the east side service door to the garage." R. 26-4 (Police Report at 4)

"altercation" with Sawinski in their shared garage, Rayfield had violated both the prohibition against "confronting" Sawinski and the prohibition against "remaining on property . . . occupied by [Sawinski]." Moreover, prior to responding to the call, the officers confirmed that the PPO was still in place. *Id.* ¶ 28 (Page ID #86). And although Rayfield contends that the officers knew he had previously gone to court to vacate the PPO, when Rayfield raised this issue during his arrest, the officers checked again and "RADIO confirmed that the PPO was still valid." *Id.* ¶ 29 (Page ID #86).

Rayfield's assertions regarding the officers' knowledge about the impracticality of enforcing the PPO and Sawinski's allegedly invalid basis for seeking the PPO do not undermine this finding. First, assuming both officers understood the impracticality of enforcing a PPO against neighbors who shared a garage, the mere fact that an order is difficult to enforce does not suggest that it cannot therefore be violated.

Second, although Hornbacher requested that the PPO be lifted following Rayfield's arrest because "[Sawinski] has shown that she is willing to confront and aggravate [Rayfield] (and he the same to her)" and Hornbacher did not believe that Sawinski "feared for her safety," at the time of his arrest, the PPO was still validly in effect. *Id.* ¶¶ 28–30 (Page ID #86). As noted above, at the time of Rayfield's arrest, a reasonable officer could conclude that Rayfield was in violation of the clear language of the still-effective PPO when he engaged in an "altercation" with Sawinski in their shared garage. Moreover, while the report indicated that Hornbacher did not believe that

(Page ID #162). We note that the Amended Complaint quotes from other sections of Hornbacher's report. R. 15 (Am. Compl. ¶¶ 28–31) (Page ID #86).

Sawinski truly "feared for her safety," the report also explained that Sawinski and Rayfield had repeatedly "confront[ed] and aggravate[ed]" each other. *Id.* ¶ 30 (Page ID #86). This suggests that, when Sawinski reported the "altercation" on October 1, 2014, Hornbacher could reasonably believe that, yet again, Rayfield was "confronting" Sawinski, directly in violation of the plain language of the PPO. R. 26-1 (PPO at 1) (Page ID #152). For similar reasons, even assuming Hornbacher and Glowney were aware of the August 2014 report in which Sawinski allegedly admitted that she had secured the PPO in order to "circumvent" the eviction process, R. 15 (Am. Compl. ¶ 23) (Page ID #85), Hornbacher and Glowney were still faced with a situation in which (1) a valid PPO was in effect against Rayfield and (2) Rayfield was engaging in an "altercation" with the PPO petitioner. This was sufficient to establish probable cause to arrest Rayfield for violating the PPO.[7]

This leaves us with the issue of whether, prior to arresting Rayfield, the officers were required to view the video that, according to Rayfield, showed that Sawinski was the aggressor and that he had not violated the PPO. As noted above, when determining whether probable cause

---

[7]Admittedly, if Rayfield's arrest had been predicated only on Sawinski's eye witness statement that Rayfield had accosted her, both the August 2014 report and Hornbacher's own conclusions in his police report may have defeated a finding of probable cause. *See Ahlers*, 188 F.3d at 370 (noting that "[a]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken" (internal quotation marks omitted)). However, because Rayfield stated in his amended complaint that Sawinski had called the police "pertaining to an altercation with [Rayfield]," R. 15 (Am. Compl. ¶ 26) (Page ID #86), and explained that, at the very least, Sawinski had confronted him in the garage, Rayfield does not challenge that an altercation occurred. Consequently, Sawinski's eyewitness account of the incident is not the sole basis supporting probable cause in this case.

16

exists to arrest an individual, officers "cannot simply turn a blind eye" to exculpatory evidence, *Ahlers*, 188 F.3d at 372, or "ignore information which becomes available in the course of routine investigations," *Fridley*, 291 F.3d at 873. However, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371; *see also Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (noting that a suspect's "plausible explanation" for suspicious behavior does not "require the officer to forego [an] arrest pending further investigation if the facts as initially discovered provide probable cause").

In general, had Hornbacher and Glowney arrested Rayfield solely for violating the PPO's prohibition on "confronting" Sawinski, the officers should have reviewed the video before arresting Rayfield, as it allegedly contained exculpatory—and corroborative—evidence showing that Rayfield had not violated the PPO. Specifically, unlike cases in which a suspect merely tells officers that he is innocent or offers an innocent explanation for his suspicious actions, Rayfield attempted to show Hornbacher and Glowney documentary evidence which, he contends, *proved* that Sawinski was the aggressor and, therefore, he had not violated the PPO. *Cf. Klein*, 275 F.3d at 552 ("Where the police have sufficient inculpatory evidence to give rise to a determination of probable cause and they *do not know* of any exculpatory evidence, we have held that 'the failure to make a further investigation does not negate probable cause.'" (emphasis added) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 173 (6th Cir. 1987))); *Fridley*, 291 F.3d at 874–75 (concluding that officers do not have to investigate a defendant's possible affirmative defense before arresting him unless the officers "conclusively knew" the defense applied to him). Here,

17

the need to view the potentially exculpatory video is particularly notable given the abstract facts of this case, as Rayfield's amended complaint indicates that, at the very least, Hornbacher suspected both that the PPO was unnecessary and that Sawinski, the only eye witness, had not been truthful about her fear of Rayfield when she secured the PPO. *See Gardenhire*, 205 F.3d at 316–18 (noting that "[a] police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime" and concluding that there was a question of material fact as to the existence of probable cause when the police relied on the testimony of only the complainant and did not investigate the suspects' statements and evidence suggesting that the complainant had actually stolen from the suspects). Although officers are not required to conduct further investigations to disprove possible affirmative defenses or to corroborate a suspect's proclaimed innocence, when a suspect presents allegedly exculpatory, and quickly ascertainable, evidence showing that the officers' basis for probable cause is inaccurate, those officers may not turn a "blind eye" to that evidence in favor of the inculpatory evidence. *Ahlers*, 188 F.3d at 372.

The problem for Rayfield, however, is that the video was not, in fact, exculpatory evidence. Rayfield contends that the video would have shown that: (1) Sawinski, rather than Rayfield, was the aggressor; and, (2) Rayfield had therefore not violated the PPO. R. 15 (Am. Compl. ¶ 31) (Page ID #86). But even if the video *had* shown that Sawinski was the aggressor, this would not have undermined the officers' conclusion that Rayfield had violated the PPO. The PPO prohibited Rayfield from "remaining on property [that Sawinski] occupied." R. 26-1 (PPO at 1) (Page ID #152). Rayfield notes in his amended complaint that Sawinski reported an "altercation" between

the two of them. R. 15 (Am. Compl. ¶ 26) (Page ID #86). Consequently, even if Sawinski initiated the altercation, because there was, in fact, an altercation between the two on property that Sawinski "occupied," reasonable officers could conclude that Rayfield had violated the PPO. Viewing the video would not have changed that fact or the probable cause calculus; Hornbacher and Glowney, therefore, were not required to view it. *Cf. In re Kabanuk*, 813 N.W.2d 348, 352 (Mich. Ct. App. 2012) ("[O]ne who holds a PPO is under no obligation to act in a certain way. Instead, a court must look only to the behavior of the individual against whom the PPO is held.").

For all the reasons stated above, we agree that, even taking all of Rayfield's allegations as true, Rayfield has not plausibly asserted that Hornbacher and Glowney lacked probable cause to arrest him for violating the PPO. We consequently affirm the district court's dismissal of Count I for failure to state a claim.

## 2. Unlawful Detention

In Count II and Count III, Rayfield contends that Hornbacher, Glowney, and John Doe City defendants violated his Fourth Amendment rights when they detained him in jail without probable cause. R. 15 (Am. Compl. ¶¶ 60, 67 (Page ID #91–92) (asserting in Count II that "[t]he Fourth Amendment prohibits [the] government from detaining a person before they are charged with a crime in the absence of probable cause" and that "Defendants lacked legal justification, or probable cause, to detain Plaintiff for this period of time"); *id.* ¶ 81 (Page ID #94) (asserting in Count III that "Defendants lacked legal justification, or probable cause, to detain Plaintiff for 72 hours"). Rayfield also asserts that, by detaining him for three days, Hornbacher, Glowney, and John Doe City defendants violated Michigan Compiled Laws § 764.15b(2). *Id.* ¶¶ 59–72 (Page ID #91–93).

19

In Count III, Rayfield again contests the length of his detention without probable cause, this time under the Due Process Clause of the Fourteenth Amendment. *Id.* ¶¶ 73–86 (Page ID #93–95).

The district court correctly granted the defendants' motions to dismiss these claims. First, to the extent that Rayfield bases his § 1983 wrongful-detention claim against Hornbacher, Glowney, and the John Doe City defendants on their violation of the 24-hour detention limit under Michigan law, such an allegation is not cognizable under § 1983. *Harrill v. Blount County*, 55 F.3d 1123, 1125 (6th Cir. 1995) ("The violation of a right created and recognized only under state law is not actionable under § 1983."); *Unger v. City of Mentor*, 387 F. App'x 589, 592 (6th Cir. 2010) (affirming the district court's dismissal of the plaintiff's claim alleging a violation of Ohio's public employees collective bargaining statute under Rule 12(b)(6) because "[a] state law, like Ohio's collective bargaining statute, cannot create a federal right and therefore cannot underlie Unger's § 1983 claim").

Second, although the Supreme Court has recognized that detention without probable cause would violate the Fourth Amendment, *see Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017), as noted above, Hornbacher and Glowney had probable cause to arrest—and thereafter detain—Rayfield for violating the PPO. Similarly, to the extent Rayfield raises this same argument under the Due Process Clause of the Fourteenth Amendment, rather than the Fourth Amendment, *see* Count III, it likewise fails.

Third, although Rayfield's claim under the Due Process Clause of the Fourteenth Amendment in Count III is somewhat vague and, moreover, repetitive of the allegations raised in Count II, we agree with the district court's conclusion that any allegations relating to the length of

Rayfield's detention absent probable cause must be brought under the Fourth Amendment, not the Fourteenth Amendment. *See Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006), *cert. denied*, 549 U.S. 1114 (2007) ("[C]laims which allege continued detention without probable cause must be pursued and analyzed under the Fourth Amendment."). We therefore affirm the district court's dismissal of Count III on that ground.

Finally, we agree with the district court that Rayfield has failed to state a claim upon which relief may be granted against Hornbacher, Glowney, and John Doe City defendants for the allegedly unconstitutional length of Rayfield's detention—"nearly three days." *See* R. 15 (Am. Compl. ¶ 67) (Page ID #92) ("Defendants held Plaintiff for nearly three days. Defendants lacked legal justification, or probable cause, to detain Plaintiff for this period of time."). The length of an individual's pre-hearing detention under the Fourth Amendment is governed by *County of Riverside v. McLaughlin*, in which the Supreme Court recognized that when a suspect is arrested without a warrant, he generally must be provided a probable-cause hearing within 48 hours of his arrest. 500 U.S. 44, 56 (1991). If an arrested individual does not receive a hearing within that timeframe, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57.

Rayfield contends that, by not ensuring that he received a hearing within the prescribed timeframe, Hornbacher, Glowney, and John Doe City defendants violated his Fourth Amendment rights. R. 15 (Am. Compl. ¶ 67, 70) (Page ID #92–93) (asserting that "Defendants lacked legal justification, or probable cause, to detain Plaintiff for this period of time" and explaining that "Defendants were well aware that Plaintiff would miss his [eviction-action] court date if he were

21

detained on October 2; the fact that he had this date was noted in the police report and should have been communicated by the arresting officers to the County of Kent when Plaintiff's custody was transferred"); *id.* ¶ 44–45 (Page ID #88) ("Plaintiff protested to the persons detaining him at the County of Kent facility, several times, that he need[ed] to be in Court on October 2. Despite this fact, [the Grand Rapids Police Department] failed to make arrangements to transport Plaintiff to his hearing on the 2nd or to ensure that the County of Kent would do so after transferring his custody.").[8] It is admittedly arguable that when Hornbacher, Glowney, or the John Doe City defendants[9] transferred custody of Rayfield to the County facility, they should have alerted the County officials regarding the length of time that they had previously detained Rayfield, to ensure that Rayfield was not detained for a *total* of more than 48 hours before a hearing. *See Cherrington v. Skeeter*, 344 F.3d 631, 644 (6th Cir. 2003) (noting that a person's right to receive a probable-

---

[8]This is a generous reading of Rayfield's amended complaint. Although Rayfield cited the Fourth Amendment in the caption of Count II and vaguely stated "[a]t no point during this *more than 48-hour* period was he ever taken before a Circuit Court judge, a District Court judge, or given bond," R. 15 (Am. Compl. ¶ 64) (Page ID #92), the enumerated allegations do not reference the Fourth Amendment or *County of Riverside*. Rather, Rayfield focuses on the 24-hour detention limit under Michigan law, which, as noted above, does not provide a basis for a § 1983 claim. Indeed, the only time that Rayfield connects the length of his detention with a *constitutional* right is in Count IV, which relates to municipal liability. *See id.* ¶ 95 (Page ID #96) ("Plaintiff was unlawfully detained for nearly three days in violation of Michigan law and his constitutional rights.").

[9]Although we will apply Rayfield's prolonged detention claim to the John Doe City defendants, we note that Rayfield has not asserted whether any City officials besides Hornbacher or Glowney were ever involved in his detention, either before or after he was transferred to the County facility.

22

cause hearing within 48 hours was "clearly established" and remanding for the district court to consider what role the individual officers actually had in the plaintiff's prolonged detention).

There are two primary issues, however, with Rayfield's allegations. First, Rayfield's asserted right to be in court for his eviction proceeding on October 2, 2014 (one day after his arrest on October 1, 2014) does not clearly implicate his Fourth Amendment rights under *County of Riverside*, as the Supreme Court in *County of Riverside* focused on a 48-hour detention limitation, not the 24-hour limitation Rayfield apparently demanded.[10] To the extent that the City defendants failed to provide Rayfield with a hearing on October 2, 2014, there is no allegation suggesting that this would violate the Fourth Amendment under *County of Riverside*.

Second, even if Rayfield has plausibly alleged that the City defendants violated his Fourth Amendment rights when they failed to ensure that he receive a probable-cause hearing within 48 hours, this right was not "clearly established" as applied to Rayfield's case. *See Klein*, 275 F.3d at 550 (requiring that the right be "clearly established"). "The 'clearly established' standard [ ] requires that the legal principle clearly prohibit the officer's conduct in *the particular*

---

[10]We also note that it is unclear from Rayfield's amended complaint why, precisely, Rayfield's detention was extended past the 48-hour limitation, which officials were engaged in making this decision, and the amount of control the named Defendants and the John Doe Defendants actually had in ensuring that Rayfield received a hearing. *See Cherrington*, 344 F.3d at 644 ("[B]efore a defendant may be held liable under section 1983, that defendant must first *possess* power by virtue of state law, then *misuse* that power in a way that violates federal constitutional rights." (internal quotation marks omitted)). Although the lack of factual allegations gives us serious pause, because of the other substantive issues with Rayfield's complaint, we will not rely on this issue in resolving Rayfield's appeal. *See id.* at 644–45 (remanding the plaintiff's § 1983 claim to the district court to consider whether the defendant officers were involved in the decision to extend the plaintiff's detention, and were thus liable under § 1983).

*circumstances* before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (emphasis added) (internal quotation marks omitted). Although we have recognized that, per *County of Riverside*, officers are on notice that defendants have a right to a probable-cause hearing within 48 hours, *Cherrington*, 344 F.3d at 644, *Cherrington* does not deal with the factually and legally distinct situation presented by Rayfield's case, namely when two municipalities, both of which have authority to process a detainee, jointly manage the custody of a pre-hearing detainee. Indeed, when discussing his wrongful-detention claim, Rayfield cites only *Cherrington*. *See* Rayfield Brief at 23–24. Moreover, in support of his municipal liability claim against the City and County, Rayfield states:

> The question is whether an arresting authority may be liable for constitutional violations committed by another municipal entity to whom it has regularly transfers [*sic*] custody of its arrestees. The Sixth Circuit has never answered this question.

*Id.* at 33. While we can plausibly conceive of a situation in which City and County officials would violate a detainee's rights under *County of Riverside* by failing adequately to inform the other municipal authority regarding the status of the individual's detention, Rayfield does not provide us with such a case and we have been unable to identify one. Consequently, because it was not clearly established that Defendants' failure to communicate regarding Rayfield's detention would necessarily violate Rayfield's constitutional rights, Hornbacher, Glowney, and John Doe City defendants are entitled to qualified immunity. We thus affirm the district court's dismissal of Counts II and III. *See Klein*, 275 F.3d at 550.

## C. Municipal Liability

Rayfield's final count asserts that both the County and the City violated his Fourth Amendment rights by extending his pre-hearing detention beyond the 48-hour limitation established in *County of Riverside*. *See* R. 15 (Am. Compl. ¶¶ 87–98) (Page ID #95–97).[11] "To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged violation occurred because of a municipal policy, practice, or custom; a municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'" *Brown v. Chapman*, 814 F.3d 447, 462 (6th Cir. 2016) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Along with identifying the "conduct properly attributable to the municipality," a plaintiff "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Because we have already determined that Rayfield's claims against the County were properly dismissed as time-barred, we focus our analysis on the City's liability.

---

[11]Again, this is a generous reading of Rayfield's amended complaint. Rayfield almost exclusively centers his municipal liability claims on the County's and City's failure to train their officials on the requirements under *Michigan* law. *See* R. 15 (Am. Compl. ¶¶ 89–91) (Page ID #95–96) (contending that neither the City nor the County provided its officers with "training as to Michigan law's requirements and timeframes for disposition of a person arrested for a purported PPO violation" and asserting that the agreement between the City and County regarding detainment of prisoners "does not provide adequate procedures to conform with Michigan law's requirements and timeframes for disposition of a person arrested for a purported PPO violation"). To the extent that Rayfield contends that the City and County may be held liable for failing to train their employees to follow Michigan law, such a claim is not cognizable under § 1983. *See Harrill*, 55 F.3d at 1125. Although Rayfield's apparent failure to allege a *constitutional* violation may well form an additional basis for affirming the district court's dismissal, because both the district court and Defendants addressed the merits of Rayfield's *Monell* claim, we will do the same.

Rayfield bases his *Monell* claim on the City's alleged failure to train City officials on how to ensure that, following an individual's arrest by City police officers, a person is not detained in excess of 48 hours if he is transferred to the County's custody. R. 15 (Am. Compl. ¶ 92) (Page ID #96) ("Defendants City of Grand Rapids and the County of Kent have failed utterly to train or instruct their officers in Michigan Law's requirement that a person arrested for a PPO violation shall be brought before the court within 24 hours of the arrest or else must be released on bond."); *id.* ¶ 95 ("Plaintiff was unlawfully detained for nearly three days in violation of Michigan law *and his constitutional rights*." (emphasis added)). A *Monell* claim for failure to train may be brought "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants," thereby showing the necessary "policy or custom" to establish § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Thus, Rayfield must show: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [municipality's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused [his] injury." *Brown*, 814 F.3d at 463 (quotation marks omitted). Finally, in the context of a deliberate-indifference *Monell* claim, a plaintiff must also show that the right underlying the failure-to-train claim is clearly established. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) ("The violated right . . . must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear.").

As an initial matter, and assuming we can consider the merits of Rayfield's *Monell* claim after finding that the individual defendants are entitled to qualified immunity[12], it is easily conceivable that, when two municipalities share custody over a pre-hearing detainee and fail to train their officials to ensure compliance with *County of Riverside*, a detainee's Fourth Amendment rights may well be violated. *See Cherrington*, 344 F.3d at 647 (noting, in the context of liability for a single municipality, that "[i]t surely is foreseeable that the Defendant City's police officers will occasionally make warrantless arrests, and thus will require instruction on the need to ensure that individuals arrested without a warrant are brought before a magistrate within 48 hours for a probable cause determination"); *see also Brown*, 814 F.3d at 463 (noting that under *City of Canton v. Harris*, a plaintiff may show deliberate indifference when the municipality fails "to provide adequate training in light of foreseeable consequences that could result from the lack of instruction, as would be the case, for example, if a municipality failed to instruct its officers in the use of deadly force" (internal quotation marks omitted)). This possibility is particularly heightened for individuals who are arrested by one municipality and transferred to the custody of another, as the

---

[12]It is undecided whether a municipality's liability under § 1983 is predicated on first finding that an individual officer or employee is also liable. *See, e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the department regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *accord Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *but see Winkler v. Madison County*, 893 F.3d 877, 899–901 (6th Cir. 2018) (noting that *Heller* and *Watkins* did not consider instances in which the municipality directly caused the violation, the violation was caused by government officials not named in the complaint, or the violation was caused by a combination of government-sponsored conduct that is not easily traceable to one individual official). Recognizing our unsettled precedent on this issue, because we ultimately conclude that Rayfield's *Monell* claim fails to state a claim under Rule 12(b)(6), we need not resolve this issue as it applies to Rayfield's appeal.

likelihood of miscommunication or administrative delays when more than one governmental entity is involved may well extend a person's detention beyond the time frame established in *County of Riverside*.

Despite this constitutionally precarious system, Rayfield's claim fails. Specifically, because we have already concluded that, even assuming Rayfield has plausibly alleged a constitutional violation, Rayfield's particular constitutional rights were not "clearly established," we must affirm the district court's dismissal of Rayfield's *Monell* claims for failure to state a claim. *See Arrington-Bey*, 858 F.3d at 995 (affirming summary judgment for the municipality defendant because it was not clearly established that officers would have been required to seek medical attention for the plaintiff). And although Rayfield contends that the City "had a nondelegable duty to ensure that the County of Kent did not violate the constitutional rights of arrestees," Rayfield Brief at 32, Rayfield cites only one out-of-Circuit appellate court and various district courts for support, *id.* at 32–36; *see also Gardenhire*, 205 F.3d at 311 (noting that when determining whether a right is "clearly established," a court must first look to the decisions of the Supreme Court, then to this Circuit's opinions, and finally to decisions of other circuit courts). Moreover, to the extent the Eighth Circuit's decision in *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001), is instructive on the issue of delegable duties between municipalities, we have previously suggested a difference in opinion. *Cf. Deaton v. Montgomery County*, 989 F.2d 885, 889–90 (6th Cir. 1993) (concluding that, in the context of a failure-to-train *Monell* claim, the county had no affirmative duty to determine whether the city, which had control over the plaintiff, had engaged in

constitutionally impermissible strip searches).[13]   Given this Circuit's case law, as well as the limited authority identified by Rayfield, we cannot say that, as applied to the City, Rayfield's constitutional rights were "clearly established" in October 2014.  We thus affirm the district court's dismissal of Rayfield's *Monell* claims.

## IV.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's dismissal of Rayfield's claims.

---

[13]Moreover, the nondelegable-duty doctrine seems like a poor fit for Rayfield's claim against the City, because Rayfield, unlike the plaintiff in *Young*, asserts that the City is liable for its failure to train its own officials, not its failure to train the *County*'s officials.  *See* R. 15 (Am. Compl. ¶ 89) (Page ID #95) ("Defendant City of Grand Rapids,[ ] upon information and reasonable belief, provides its police officers with no training as to Michigan law's requirements and timeframes for disposition of a person arrested for a purported PPO violation.").